[S. F. No. 4462. In Bank.—January 19, 1911.]

CONTRA COSTA WATER COMPANY (a Corporation), Respondent, v. CITY OF OAKLAND, COUNCIL OF CITY OF OAKLAND et al., Appellants.

Water Rates in Oakland—Question of Confiscation—Review of Decision of Trial Court — Rehearing — Obiter Statement Stricken Out.—Upon rehearing of the former decision of this court, filed July 6, 1909, involving a review of the action of the trial court in setting aside water rates fixed by the council of the city of Oakland for a specified time for the Contra Costa Water Company, as confiscatory, it is held that a statement made *obiter* in the opinion relative to a possible return of about three and one half per cent, upon an assumption as to the value of the property, without intimating that such rate would not be held confiscatory, will be stricken out as unnecessary to the opinion rendered.

Id.—Rate of 4.682 per cent Net Necessary to Decision—Condition of Record—Finding against Evidence—Possible Support of Finding.—What was said in the opinion relative to a return to the stockholders of 4.862 per cent net, was necessary to the decision, in view of the condition of the record, not only showing that the finding of the value of seven million dollars is against the evidence, which would not alone justify the reversal of the judgment, but also showing that the evidence would not support any possible finding of value greater than one half of that amount.

Id.—Basis of Decision Not Ideal of Return—Proper Exercise of Legislative Power.—The theory of the decision in favor of such rate, as not confiscatory, is not based upon any ideal of what would be a fair and full return if this court were fixing rates, but upon the

opinion from the evidence in the record that a court would not be warranted in holding it beyond the power of a legislative body to fix.

ID.—ELEMENTS IN DETERMINING WHETHER RATE IS CONFISCATORY.—In determining whether a given rate is or is not confiscatory the court must ascertain: 1. The value of the property upon which the plaintiff is entitled to seek a return; and 2. What is the percentage of return to which the plaintiff is entitled upon such value. The range of judicial inquiry must be as wide in the case of one of these elements as in that of the other.

ID.—ASCERTAINMENT OF PERCENTAGE—LOWEST PERCENTAGE PROPERLY DEEMED REASONABLE.—In determining the ultimate issue whether the city ordinance deprives plaintiff of its property without just compensation, it must be ascertained whether the return allowed will give less than the lowest reasonable percentage of profit upon actual value of the property. In fixing such percentage, the court is not to act upon it as an original question as to what might be fair and reasonable, but is to determine what is the *lowest* percentage which can properly be thought by the rate-fixing body to be fair and reasonable.

ID.—RANGE OF DISCRETION OF CITY COUNCIL.—On the question of fixing the percentage there must be a certain range of discretion which may be traversed by the city council without infringing upon constitutional rights. If the ordinance gives a rate of return, which, although low, is not palpably unreasonable, the court is not to upset its action because it may think a higher rate appropriate.

ID.—PRESUMPTION IS IN FAVOR OF LEGISLATIVE DETERMINATION—BURDEN OF PROOF.—The presumption is in favor of the legislative determination of the city council, and the burden is upon the attacking party to show its invalidity.

ID.—RATE UPHELD NOT DECLARED AS MATTER OF LAW.—This court in upholding the net rate of 4.862 per cent as that supported by the evidence appearing in the record, and as not confiscatory, does not intend to declare and does not declare, *as matter of law*, that this rate is in all cases adequate or above the dividing line which separates lawful regulation from confiscation. The propriety of any rate must be determined by the evidence introduced upon the trial of the particular case.

ID.—RIGHT TO FIX RATES FOR USE OF WATER—LEGISLATIVE DISCRETION— HONEST JUDGMENT—JUDICIAL DUTIES.—The right delegated by the state constitution to the governing body of a city or town in which water is distributed to the inhabitants to fix rates therefor annually calls for the exercise of a legislative function, in the exercise of which the legislative officers, in determining what will be the proper rate of compensation, are necessarily obliged to use some degree of discretion and judgment, and are bound to exercise an honest judgment as to the matters submitted for their determination. To this extent their duties, in the exercise of their legislative function, are judicial in their nature.

ID.—POWER OF REVISION BY COURTS.—The courts have no power to revise the mere legislative action of the rate-making body in that regard. It can only be assailed on some constitutional ground; and if its action is confiscatory, and deprives the water company of a just compensation, the courts will enforce the constitutional mandate, and declare the ordinance void. This is the full extent of the power of the courts in the matter and the basis upon which it rests.

ID.—RIGHTS OF WATER COMPANY — FAIR RETURN UPON REASONABLE VALUE OVER DEDUCTIONS.—A water company engaged in furnishing water to the public is entitled to a fair return upon the reasonable value of its property at the time it is being used by the public, over and above its operating expenses, including current repairs and taxes, besides an annual allowance to provide for depreciation in value.

ID.—QUESTIONS FOR RATE-FIXING BODY—BURDEN OF PROOF ON WATER COMPANY.—The questions of the reasonable value of the property, the amount of expenses, the amount of allowance for depreciation, and what under all the circumstances will be a fair compensation to the owner, are for the rate-fixing body, and the courts should never set aside the action of that body on the ground that it deprives the party furnishing water of a just compensation, unless the party assailing its ordinance assumes the burden of showing that fact, so as to make it clearly appear. If there is doubt, the expressed will of the legislative body should be sustained.

ID.—FUNDAMENTAL QUESTIONS—PRESENT REASONABLE VALUE OF PROPERTY—RATE NOT CONFISCATORY.—The material question in a judicial investigation as to the sufficiency of compensation relates to what is the present reasonable value of the property devoted to public use. It is held, that a net revenue of 4.682 per cent, under the circumstances proved, cannot be held confiscatory.

ID.—IMPROPER ALLOWANCES—PAST DEPRECIATION—GOOD-WILL OF GOING CONCERN.—No proper allowance could be made for any past depreciation nor for what is known as the good-will of a going concern, neither of which can be considered at all in determining the present value of the property.

ID.—FAIRNESS OF ACTION OF CITY COUNCIL.—It is held that there is no evidence of unfairness or want of good faith in the action of the city council, and it appears that all fairness of statement and hearing was accorded to the water company, and that the evidence is not sufficient to show that the rates were established by arbitrary conjecture and not based on investigation or the exercise of judgment and discretion.

ID.—IMMATERIAL FINDINGS AS TO ACTION OF CITY COUNCIL—ABSENCE OF FINDING OF VALUE SUPPORTED BY EVIDENCE.—The findings as to the action of the council are immaterial whether sustained by the evidence or not, in view of the absence of any finding of value of the property of the water company sustained by the evidence, which renders it indeterminable that the compensation afforded by the ordinance is not just and reasonable. If it is so in fact, the water

company cannot complain in the courts as to the methods used by the council in arriving at the conclusions embodied in the ordinance.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. E. C. Hart, Judge presiding.

The facts are stated in the opinion of the court.

J. E. McElroy, City Attorney, John W. Stetson, and Carl H. Abbott, for Appellants.

John Garber, Garret W. McEnerney, and Frank Cleary, for Respondent.

Ralph C. Harrison, and Jesse W. Lilienthal, *Amici Curiæ,* and Page, McCutchen & Knight, and Heller, Powers & Ehrman, *Amici Curiæ,* for Respondent.

ANGELLOTTI, J.—An opinion was filed in this case on July 6, 1909, written by Justice Angellotti, and concurred in by Justices Shaw, Sloss, and Lorigan. A rehearing was granted in order that further consideration might be given to certain matters discussed in the petition for rehearing and in briefs filed by plaintiff and other parties interested in the questions involved.

It was earnestly contended by learned counsel representing plaintiff and other public-service corporations that the portion of the opinion filed in this case relative to returns to the stockholders of about 3½ per cent per annum on the value of the property of plaintiff may be construed as intimating that this court would not hold even such a rate confiscatory. We are satisfied that it cannot reasonably be construed as intimating anything of the kind. It is simply a statement to the effect that this question is *not* presented for decision in this case, and was made in view of the fact that there was some evidence to the effect that the annual depreciation might amount to two per cent per annum, which would reduce the net return to the stockholders on a basis of valuation of three million five hundred thousand dollars, to a little over 3½ per cent per annum. But as the trial court had not found as to

the annual depreciation and as the record would support a finding of not exceeding one per cent per annum for such annual depreciation, we freely concede that the expression was not at all necessary to the decision, and can see no objection to striking it from the opinion.

What was said in the opinion relative to a return to the stockholders of over 4½ per cent net,—namely, 4.682 per cent,—was necessary to the decision, in view of the condition of the record, as the opinion clearly shows. If it had been admitted by the pleadings or established by evidence without conflict that the value of plaintiff's property was such that the rates fixed by the ordinance would yield such a small return to the stockholders that the courts would be compelled to hold that the rates fixed were confiscatory we would not have felt called upon to reverse the judgment declaring the ordinance void, even though the finding of the seven-million-dollars valuation is not supported by the evidence. The ordinance being clearly void upon facts admitted by the pleadings or shown by undisputed evidence, it would have been unnecessary to put the parties to the expense and loss of time involved in another trial, as well as to delay the final disposition of the action. But no value in excess of three million dollars being admitted by the pleadings in this case, and there being evidence that would have sufficiently supported a finding of value as low as three million five hundred thousand dollars, we were constrained to deal with the appeal, in the absence of a finding of value sufficiently supported by evidence, on the theory that the value was no greater than the lowest amount as to which a finding would have been held to have been sufficiently supported by the evidence contained in the record. That amount we practically declared to be three million five hundred thousand dollars. If on that basis of valuation the rates fixed by the ordinance were confiscatory, it would have been useless and unprofitable to require plaintiff to further carry on this litigation to obtain the relief to which it was clearly entitled and which it must ultimately be granted. This situation presented the necessity for determining whether the return given by the ordinance on a three-million-five-hundred-thousand-dollar valuation was confiscatory. Upon the record we were compelled to assume that the ordinance would give a net return to the stockholders, after payment of all expenses,

including taxes, and with sufficient allowance for annual depreciation of the value of the property, of 4.682 per cent per annum. The trial court has not in terms found that this percentage is unreasonable, but, in view of the nature and purpose of this proceeding, the finding that a fair return to plaintiff is seven per cent on the value of its plant, involves, by necessary implication, a finding that any lesser rate of return is unreasonable. As to this return (4.682 per cent) we said that while we were not to be understood as intimating that such a return would be considered by us a full and fair return under all the circumstances, were we engaged in the exercise of the function of fixing rates, we did not believe that upon the record before us a court would be warranted in holding it to be beyond the power of a legislative body to fix; in other words, that upon the record before us we could not hold that the rates fixed were confiscatory. We see no reason for modifying our expression of views in this regard. This conclusion does not involve any contradiction of the proposition, earnestly advanced by respondent, that the question whether the percentage of return allowed by a rate-fixing ordinance is reasonable or unreasonable is one of fact, to be determined in the first instance, like other questions of fact, by the trial court, upon the evidence given in the particular case. In the effort to determine whether a given rate is or is not confiscatory, two elements must necessarily be inquired into: 1. The court must ascertain the value of the property upon which the plaintiff is entitled to seek a return; and 2. It must determine what is the percentage of return to which the plaintiff is entitled upon such value. In order to say whether or not a given scale of charges will take property without just compensation, it is as essential to know what is a fair ratio of return upon property devoted to the use in question as it is to know what amount or value of property is so devoted. The range of judicial investigation must be as wide in case of the one element as in that of the other. If the rates fixed yield less than the lowest percentage of profit which is ordinarily obtained in the locality upon equally safe and permanent investments in enterprises of a kindred character the regulation is as clearly confiscatory as if no return at all is provided upon a portion of the property actually employed. The ultimate issue is whether the ordinance deprives plaintiff of

its property without just compensation, but, in order to answer this issue in the affirmative, the trial court must find, either in terms or impliedly, that the return allowed will give less than the lowest reasonable percentage of profit upon the actual value of the property devoted to the public use. In fixing upon such percentage, however, the court is not to act upon what it, as an original question, might think to be fair and reasonable, but is, rather, to determine what is the *lowest* percentage which could properly be thought by the rate-fixing body to be fair and reasonable. On this question, there must be a certain range of discretion which may be traversed by the city council without infringing upon constitutional rights. If the ordinance gives a rate of return which, although low, is not palpably unreasonable, the court is not to upset the action of the council because it may think a higher rate more appropriate. The presumption is in favor of the validity of the legislative determination, and the burden is on the party attacking the rate fixed to show its invalidity. Applying these principles, we held, in our former opinion, and now hold, that the evidence in this case did not warrant a finding that a net return of 4.682 per cent was less than the lowest rate of return which the city council might fairly have determined to be just. We did not, and do not, intend to declare that this rate is, *as matter of law,* adequate or above the dividing line which separates lawful regulation from confiscation. The minimum rate of percentage justly returnable must, in any other case, or in another trial of this case, be determined upon the evidence introduced in the trial of the particular case. All this, we think, is, in effect, stated in the original opinion. We have here amplified the discussion in order to meet the fears, expressed by counsel petitioning for a rehearing, that our decision would be taken as announcing, as a rule of law applicable to all cases and under all circumstances, that a net return of 4½ per cent upon property devoted to a public use will not be regarded by the courts as confiscatory.

As to all other questions, we adhere to the views expressed in the opinion.

The opinion heretofore filed, omitting the portion first discussed, being that portion relative to the return to the stockholders of about 3½ per cent per annum, was as follows:—

"This action was commenced in the superior court of Ala-

meda County on April 5, 1900, by plaintiff, a corporation formed and existing for the purpose of supplying the city of Oakland and other cities and towns in Alameda County and the inhabitants thereof with water, against said city of Oakland and the members of the city council, to obtain a decree adjudging void an ordinance adopted on March 26, 1900, by such council, fixing the rates to be collected by plaintiff for the water to be furnished such city and its inhabitants for the year commencing July 1, 1900, and ending June 30, 1901, restraining its enforcement, and requiring the council to adopt, after full investigation and opportunity to plaintiff to be heard, an ordinance fixing just and reasonable rates for such year. The general ground stated for this relief was that such ordinance was adopted by the council arbitrarily and without any sufficient investigation or any opportunity to plaintiff to be heard upon the question of the reasonableness of the rates proposed thereby, that the rates fixed thereby were unreasonable, unjust and oppressive, and did not permit of nor provide for a just or fair compensation to plaintiff, and that the effect thereof would be to take away plaintiff's property without due process of law by depriving it of any fair return upon its property and in such service of furnishing water.

"Judgment was given in favor of plaintiff on May 28, 1901. The bill of exceptions for use on motion for new trial and appeal was settled by the trial judge on April 8, 1905, on which day defendants' motion for a new trial was denied. Appeals were taken by defendants from the judgment and the order denying a new trial, and these appeals were submitted to this court for decision in January of this year.

"The trial court found that the property of plaintiff necessary to enable it to furnish the city of Oakland and its inhabitants with water, being its reservoir sites, reservoirs, water-rights, and other rights necessary to secure the absolute ownership of the water caught and impounded, land, pumping and other works, many miles of water-pipe laid for distributing waters, buildings and improvements, are of the value of $7,000,000. There is nothing in the findings to indicate, except as just stated, what items of property were taken into consideration as constituting this aggregate of property found to be worth $7,000,000, or the value given to any particular item, except that it is further found that the properties known

as the Pleasanton Sink, Central Reservoir, and the Glue Works Plant are not used for supplying the city of Oakland or its inhabitants with water, and constitute no part of the property which the court found to be of the value of $7,000,-000. The court further found, according to a stipulation of the parties, that the operating expenses of plaintiff which must be incurred during the year ending June 30, 1901, including all taxes, will amount in the aggregate to $134,200, seven eights of which will be incurred in supplying the city of Oakland and its inhabitants, and the other one eighth in supplying the towns of San Leandro and Emeryville and a portion of the city of Berkeley, and the inhabitants thereof, and also the county of Alameda for certain purposes. Adopting the theory of plaintiff that the ordinance would reduce the receipts under the ordinance of the next preceding year twenty-five per cent, a conclusion that we cannot hold is without sufficient support in the evidence, it further found that the gross income under the ordinance in question for the year 1900-01 from all sources would not exceed $323,500, of which $51,750 would be received from consumers other than the city of Oakland and its inhabitants. Except in so far as this failed to take into account and add to the gross receipts $13,230.91, the amount of rebates shown to have been made by plaintiff to certain consumers during the preceding year, and except also that under the stipulation of the parties the gross receipts would amount, without adding such rebates, and with a twenty-five per cent deduction, to $323,561, the finding was sufficiently supported by the stipulation of the parties and the evidence. This conclusion is based entirely on the assumption of the parties that there would be no increase in the business over that of the preceding year. Deducting from these gross receipts the amount of such operating expenses, including taxes, which we shall take in round numbers at $135,000, as the same are taken in the calculations contained in appellants' brief, left the probable net revenue for the year under the ordinance in question at $188,561.66 under the findings without adding the rebates, and at $198,898.31 if the rebates are added to the gross receipts, as we are satisfied they should be. Upon these facts, it appears that the net revenue of plaintiff from its property on the basis of $7,000,000 valuation would be but 2.841 per cent, without

any allowance for depreciation in the value of the plant. The court found that a fair return and rate of interest for the year 1900-01, and a just and reasonable rate for the water to be supplied, is seven per cent on $7,000,000, over and above the operating expenses and taxes, and that plaintiff is entitled to receive for the water furnished by it to the city of Oakland and its inhabitants at least that amount, less the income derived by it from consumers outside the said city, amounting as hereinbefore stated to $51,750. It further found substantially that the ordinance was passed without any opportunity to be heard against it on the part of the plaintiff or other persons interested, that no consideration was given to a large and material part of plaintiff's property, that at the meeting at which the ordinance was finally passed, March 26, 1900, plaintiff offered to produce evidence to show that it was unreasonable but that the council refused to allow it to do so, although this was the first opportunity plaintiff had to present its objections; that the rates fixed were fixed arbitrarily and without any consideration of or regard to the right of plaintiff to a reasonable consideration, etc., and that the subject of said ordinance and water rates was not carefully considered by the individual members of the council.

"Upon these findings a decree was entered adjudging the ordinance null and void, and setting aside, vacating and annulling the same, adjudging that plaintiff is entitled to have rates for supplying fresh water to the city of Oakland and its inhabitants for the year commencing July 1, 1900, and ending June 30, 1901, so fixed that they will in the aggregate afford to plaintiff a just and reasonable compensation, and as will yield a sufficient income to pay its expenses and taxes and a reasonable rate of interest upon the value of plaintiff's property decreed to be the sum of $7,000,000, ordering the city council to forthwith fix the rates for said year 'in accordance with the principles established in this decree,' and enjoining the defendants from enforcing or attempting to enforce the said ordinance.

"The general principles applicable in cases of this character are now fairly well settled. Under the provisions of our state constitution, the use of all water appropriated for sale, rental, or distribution is a public use, subject to the regulation and control of the state, and the rates to be collected by any per-

son, company or corporation in this state for the use of water supplied to any city or town, or the inhabitants thereof, must be fixed, annually, by the city or town council or other governing body of such city or town.   (Art. XIV, sec. 1.)   As was said in *Spring Valley Water Company* v. *San Francisco,* 165 Fed. 676, this provision of our constitution is justified and sustained by the well-settled principle enunciated in *Munn* v. *Illinois,* 94 U. S. 113, 126, [24 L. Ed. 77], that where one devotes his property to a public use, 'he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created, . . . so long as he maintains the use. . . . When private property is devoted to public use, it is subject to public regulation.'   If the right to regulate exists, the right to establish the reasonable compensation for services as one of the means of regulation is implied. The exercise of this right on the part of the state is a legislative function.   As is the case in regard to many other legislative acts, the legislative officers in determining what will be the proper rate of compensation are necessarily obliged to use some degree of judgment and discretion, and are 'bound in morals and in law to exercise an honest judgment as to all matters submitted to their official determination.'   (*Spring Valley Water Works* v. *Schottler,* 110 U. S. 354, [4 Sup. Ct. 48, 28 L. Ed. 173].)   To this extent, their duties in the exercise of their legislative function are judicial in their nature. But, as was said by the supreme court of the United States in the recent case of *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, [29 Sup. Ct. 148, 53 L. Ed. 371]: 'The function of rate-making is purely legislative in its character, and this is true, whether it is exercised directly by the legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated.   The completed act derives its authority from the legislature and must be regarded as an exercise of the legislative power.'   This was fully recognized in the opinions in the case of *San Diego Water Co.* v. *San Diego,* 118 Cal. 556, [62 Am. St. Rep. 261, 38 L. R. A. 460, 50 Pac. 633].   The courts have no power to revise the action of the rate-fixing body in this regard.   No authority is given by the law for any such review by a judicial tribunal.   If an ordinance fixing rates is enacted in the man-

ner provided by law, it can be set aside by the courts only where it is invalid on some constitutional ground. Under our constitutional guaranties, federal and state, no one can be deprived of his property without just compensation, and if the effect of an ordinance fixing water rates is to deprive one engaged in the exercise of such public use of a fair return upon his property used in such service, such act deprives the party of the lawful use of his property, 'and thus, in substance and effect, of the property itself,' in violation of the constitutional provisions. (*Chicago etc. R. R. Co.* v. *Minnesota,* 134 U. S. 418, 458, [10 Sup. Ct. 462, 702, 33 L. Ed. 970].) Where such is the effect, the courts, enforcing the mandate of the constitutional provisions, will hold the ordinance to be void and prevent its enforcement. This is the full extent of their power in such a matter, and the basis upon which such power rests. As said in *San Diego Water Co.* v. *San Diego,* 118 Cal. 556, [62 Am. St. Rep. 261, 38 L. R. A. 460, 50 Pac. 633] : 'The function of the courts is merely to ascertain whether the power has been carried beyond the constitutional limits so fixed; and, if such be found to be the case, to declare the acts of the council void. They do not sit as appellate tribunals to review the correctness of the council's determination, nor need they know anything about the evidence on which that body has acted. All that they have to consider is, whether, in a given case, the result of the council's action will be to take the property of the complaining party without just compensation.' The ultimate question in any judicial proceeding of this character is whether the rates fixed are confiscatory. It is now settled that what one engaged in furnishing water to the public is entitled to demand 'is a fair return upon the reasonable value of the property at the time it is being used for the public,' over and above its necessary operating expenses, including current repairs and taxes. (*San Diego etc. Co.* v. *National City,* 174 U. S. 739, 757, [19 Sup. Ct. 804, 43 L. Ed. 1154] ; *San Diego etc. Co.* v. *Jasper,* 189 U. S. 442, [23 Sup. Ct. 571, 47 L. Ed. 892] ; *County of Stanislaus* v. *San Joaquin Co.,* 192 U. S. 201, [24 Sup. Ct. 241, 48 L. Ed. 406].) To this should probably be added, in a case where the property is irrevocably devoted to a public use, as intimated by the United States supreme court in *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, [29 Sup. Ct.

148, 53 L. Ed. 371], an annual allowance to provide for making good the depreciation which must occur in much of the property used in such a service. The court said: 'The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years the original investment remains as it was at the beginning.' This is in line with what was said by Chief Justice Beatty in *San Diego Water Company* v. *San Diego,* 118 Cal. 556, [62 Am. St. Rep. 261, 38 L. R. A. 460, 50 Pac. 633]. It is the plain duty of the legislative body fixing rates to take all of the elements properly involved in the determination of the question of the present value of the property used in the public service into consideration, and having ascertained that value, to fix such rates as will allow the person engaged in furnishing the water, over and above its operating expenses, taxes and current repairs, such amount as will fairly compensate him for the annual depreciation in the property, and leave him with what, under all the circumstances, will be a fair and just return for the use by the public of his property. All of these questions, the value of the property, the amount of expenses, the amount of allowance for depreciation, and what, under all the circumstances, will be a fair compensation to the owner, are, however, for the rate-fixing body, and the courts should never set aside the action of that body upon the ground that it deprives a party furnishing water of his property without fair compensation, unless that fact is very clearly made to appear. The burden of making this showing is on the person who assails the law. As was said in *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, [29 Sup. Ct. 148, 53 L. Ed. 371], the judicial power of annulling legislation on this ground 'ought to be exercised only in the clearest cases.' In *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, [19 Sup. Ct. 804, 43 L. Ed. 1154], the United States supreme court said: 'Judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use.' In *Munn* v. *Illinois,*

94 U. S. 113, 126, [24 L. Ed. 77], the same court said, as has repeatedly since been said: 'Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained.'

"With these general observations, we come to a consideration of a few of the many questions presented by this appeal.

"It is self-evident that there is no more material question of fact in a judicial investigation of this character than that of the present reasonable value of the property devoted to the public use. Only by a determination of that question can we have any foundation upon which to rest a conclusion as to the sufficiency of the compensation that will be given by the rates fixed. It is the question, too, which presents the greatest difficulty, and upon which the greatest difference of opinion ordinarily exists, both before the rate-making body and in any judicial proceeding in which the action of that body is assailed. As we have seen, the trial court found that the property of the plaintiff so devoted to this use was of the value of $7,000,000. The claim of defendants, as stated in their answer, was that such value did not exceed $3,000,000. This finding of the trial court is assailed by defendants as not being supported by the evidence. If this claim of defendants be well based, the judgment must, in our opinion, be reversed, for we would then be without any finding on the question of value, and without any power or ability to supply such a finding. There was evidence which probably would have supported a finding of value very slightly in excess of the amount claimed by the defendants in their answer, $3,000,000, and which certainly would have supported a finding of a value not exceeding $3,500,000. Taking the value to be $3,500,000 only, the ordinance would afford a net revenue over operating expenses and taxes of 5.682 per cent, which is not, in our judgment, so low a rate that a court, upon the record before us, would be warranted in holding that it was beyond the power of the council to fix, even if we hold that there must be deducted therefrom what would be a fair allowance for the ordinary annual depreciation in the value of the perishable portion of the plant. What such an allowance would be has not been determined by the trial court, and we cannot say from the record. It may be that it would not amount to more than one

per cent of the value of all the property, perishable or non-perishable. Such an allowance for depreciation would be in excess of that testified to as a proper allowance on the application for an injunction in *Spring Valley Water Co.* v. *San Francisco,* 165 Fed. 676, if the opinion correctly states such testimony. In that event, we would have over 4½ per cent net for the stockholders. This certainly would be a very substantial net return, considerably more than is derived from many investments eagerly sought by capital. We do not wish to be understood as intimating that even such a return would be considered by us a full and fair return under all the circumstances, were we engaged in the exercise of the legislative power of fixing the rates. That, as said before, is not a function of the courts. We simply mean that we do not believe it to be so low, under the circumstances appearing here, as to warrant a court in holding it to be beyond the legislative power to fix. We have said this much for the purpose of showing that the judgment cannot stand if the finding of the trial court as to the value of plaintiff's property is not sufficiently sustained by the evidence. Moreover, the judgment itself finally fixes as between the parties the value of the property of plaintiff, for all the purposes of fixing rates for the year 1900-01, at least, at the sum of $7,000.000.

"We have carefully examined the record on this appeal, consisting of over fifty-five hundred printed pages, for the purpose of acquainting ourselves with the evidence upon the value of plaintiff's property used in the year 1900 in furnishing the city of Oakland and its inhabitants with water. We assume that the trial court was fully warranted in concluding that the portion of the system acquired by plaintiff from the Oakland Water Company in 1899 should be included as a portion of said property. So assuming, we are nevertheless unable to find such substantial evidence in the record as would warrant a trial court in a proceeding of this kind in concluding that the property of plaintiff was of the value of $7,000,000, or anything near that sum. All of the testimony as to the value was exceedingly unsatisfactory. It consisted almost wholly of the giving of opinions by expert witnesses as to the value, and the usual radical difference is to be found between the opinions of the experts produced by plaintiff and those produced by defendants. To add to the usual difficulty in

ascertaining the real value in such a case is the fact that most of the books and records of the Contra Costa Water Company showing details of cost of construction and operating expenses had been destroyed by the plaintiff in the year 1899. As was said recently by the supreme court of the United States regarding a case of conflict between the evidence of experts in a case of somewhat similar character, it is apparent that the total value must necessarily be more or less in doubt, and becomes matter of speculation or conjecture to a great extent. (*Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, [29 Sup. Ct. 192, 53 L. Ed. 382].) But even an analysis of the evidence of plaintiff's expert witnesses shows it to be without sufficient support for this finding. It is true that three of plaintiff's expert witnesses testified that the value exceeded $7,000,000, Mr. Adams putting it at $7,077,527, without including certain real estate valued at about $200,000; Mr. Schuyler putting it at $7,633,447, including all real estate, and Mr. Kiersted putting it at about $7,500,000. The testimony given by these witnesses, however, showed very clearly that these conclusions were not based upon data sufficiently certain to warrant their acceptance by the trial court as against the ordinance adopted by the city council.

"Both Mr. Adams and Mr. Schuyler included as a part of their total an item of $184,000, as Mr. Adams put it, to replace past depreciation in the works not provided for, and as Mr. Schuyler put it, to provide a sinking fund for such past depreciation. Clearly this had nothing to do with the question of the value of the property. Nor is the person furnishing water entitled to have any allowance made in the annual fixing of rates to cover any *past depreciation*. It is the value of the property at the time of fixing the rates that is to be ascertained and upon which the party furnishing water is entitled to an income, and the only depreciation that can be allowed for is such as may properly be apportioned to the year for which the rates are being fixed. This is made clear by the opinion in *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, [29 Sup. Ct. 148, 53 L. Ed. 371]. It is agreed by counsel that the trial court excluded this item in arriving at its conclusion. Both of these witnesses also included in their totals an item of $500,000, as the value of the going business of plaintiff. Their theory in regard to this item was, as stated by learned counsel

for plaintiff, that the property and business of the plaintiff had a value as being the property and business of a concern which, in the legal and commercial sense, is a 'going concern' and which has a thoroughly established business, over and above and in addition to the mere cost or cost of reproduction of its property and plant, and what the value of said property would be at the time when its works were just completed. So far as this may include what is generally known as 'good will,' it could not be considered at all in determining the question of value of the property. Like the Consolidated Gas Company of New York in *Willcox* v. *Consolidated Gas Co. etc.*, 212 U. S. 19, [29 Sup. Ct. 192, 53 L. Ed. 382], the plaintiff here had a monopoly in fact of the business in which it was engaged. It was the only party having water to furnish in the city of Oakland, and one having to purchase water had no other vendor to whom to resort. Of such a stipulation the supreme court of the United States said in the case last cited: 'We are of the opinion that it is not a case for a valuation of "good will." . . . The complainant has a monopoly in fact, and a consumer must take gas from it or go without. He will resort to the "old stand," because he cannot get gas anywhere else. The court below excluded that item, and we concur in that action.' It may be conceded that the fact that the works of plaintiff are in actual use as part of a going concern give them a greater value to the stockholders than they would otherwise have. It supplies the capacity to earn returns which would otherwise be wanting. Purely for the purposes of this decision, we may assume it to be true, as was said by Judge Farrington in *Spring Valley Water Co.* v. *City and County of San Francisco,* [165 Fed. 676], that the value of the going business and franchise depends upon their earning power. Where, as here, that earning power depends on the rates to be fixed annually by the city council in such a way as to give only a fair return on the property in use, and the franchise is neither exclusive nor defined by any special contract with the city, these elements would appear to play a very small part, if any, in the matter of valuation. However this may be, it is plain that none of the witnesses furnished any evidence upon which any value could be added on account of either of these items. The theory of both Mr. Adams and Mr. Schuyler was, as stated by plaintiff's counsel,

that this value was measured by the losses sustained and the deficiencies of income accruing to it, in the early period of its operations, and up to the time that it had been brought to a paying basis. Mr. Kiersted, the only other witness on this subject, measured the value of this element of 'going concern' in practically the same way. Mr. Adams, in one of his estimates, concluded as a matter of individual judgment that in an enterprise having the characteristics and magnitude of the old Contra Costa Water Company, there must have been in the inception of the concern losses or deficiencies in income to the extent of five hundred thousand dollars. In his other estimate, he made a computation of the early losses, treating them as the difference between the return of 5.63 per cent, which the company had actually received, as computed by him from its annual statements, and the return of seven per cent, which he believed it should have received. Mr. Schuyler and Mr. Kiersted followed the same general lines. This was all the evidence supporting this item. We think it very clear that it had no relation to the question of present value and afforded no basis for any valuation by the trial court of either of these elements, franchise or going concern. In this connection we quote the words of Judge Farrington in the case last cited: 'Two of the experts estimated the value of the going business to be equal to the total amount by which current rates of interest exceeded the net profits of the business prior to 1880. In other words, the value of the going business is equal to the cost of establishing the Spring Valley Water Company's business originally, and that cost is equal to the deficiency of the revenue prior to 1880. This estimate is open to the objection that the deficiency of revenue may have been due to extravagant or wasteful management. The company may have purchased a plant larger and more expensive than necessary; current rates of interest may have been abnormally high; many causes which have absolutely no relation to the value of a company's business now as a going concern may have increased or diminished the deficiency in revenue. Furthermore, if it be conceded that early deficiency of revenue is the proper measure of value for the present going concern, then it follows that the greater the deficiency and the more unprofitable the business, the greater the present value of the going concern; and if the business had yielded large profits

from its very inception, the going business to-day would be worthless. These variant methods, leading to equally variant results, are not in accord with the actual conditions. None of the estimates can be followed.' It is unnecessary to say that the burden was on plaintiff to furnish data showing that these elements had a distinct, independent productive value, before any such value could be included. (See in regard to value of franchises *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382].) In what we have said, we do not desire to be understood as deciding that in the matter of fixing water rates anything at all should be added to the value on account of the element of 'going concern.'

"So far as the evidence of Mr. Adams and Mr. Schuyler afforded any basis for a valuation of plaintiff's property by the trial court, other than the property acquired from the Oakland Water Company, such support was to be found in the evidence relating to the cost of the works and the cost of the reproduction thereof. The evidence of Mr. Adams that San Leandro Lake, including real estate and appurtenances, which was the main source of plaintiff's water supply, was worth $1,537,500, was based solely upon the theory that it supplied '615 miner's inches of water under four-inch pressure, practically constant and certain yielding capacity, at $2,500 per inch.' This valuation of $2,500 per inch was, as shown by his examination, a mere arbitrary conclusion, based upon his views as to what, under all the circumstances, would be fair, and in part upon what he thought the consumer would be able to pay. Mr. Schuyler does likewise. We find in this evidence no such certainty as renders it available as a guide to the value. Each of these witnesses included over $3,000,000 as the cost of construction of the plant (exclusive of the plant of the Oakland Water Company), or the cost of reproduction thereof. Neither of them made any deduction on account of depreciation which must have come from age and use. The Contra Costa Water Company had existed ever since 1866, and more than two-thirds of its construction work was done prior to 1886. In the case of *Knoxville* v. *Knoxville Water Co.,* [212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371], the United States supreme court said: 'The cost of reproduction is one way of ascertaining the present value of a plant like that of a water company, but that test would lead to obviously

incorrect results if the cost of reproduction is not diminished by the depreciation which has come from age and use. . . . The cost of reproduction is not always a fair measure of the present value of a plant which has been in use for many years. The items composing the plant depreciate in value from year to year in a varying degree. Some pieces of property, like real estate for instance, depreciate not at all, and sometimes, on the other hand, appreciate in value. But the reservoirs, the mains, the service-pipes, structures upon real estate, stand-pipes, pumps, boilers, meters, tools and appliances of every kind begin to depreciate with more or less rapidity from the moment of their first use. It is not easy to fix at any given time the amount of depreciation of a plant whose component parts are of different ages with different expectations of life. But it is clear that some substantial allowance for depreciation ought to have been made in this case.' A reading of the record cannot fail to convince one that the estimates of both Mr. Adams and Mr. Schuyler were practically of all the construction work that has been done since the year 1866, without any allowance whatever for the depreciation that must have occurred. It is apparent from the record that even upon the basis of an allowance of only one per cent annually for depreciation, the depreciation in the Contra Costa plant would have exceeded $500,000. According to all of defendants' witnesses except one, Mr. Miller, it was practically $1,000,000 or more. Mr. Adams himself testified that from his investigation he believed that the prevailing rate of depreciation per annum in such property was two per cent, taking the property as a whole. There is nothing in the evidence of these witnesses or elsewhere in the record to indicate any basis upon which the trial court might properly hold this element of depreciation to be offset or materially affected by appreciation in the value of any portion of the property or of the plant as a whole. So far as real estate values were concerned, including the value of San Leandro Lake and the water-rights thereunto appertaining, the testimony given was of present value.

"Both Mr. Adams and Mr. Schuyler placed the value of the plant acquired from the Oakland Water Company in 1899, which in 1900 constituted a part of plaintiff's system, at $2,550,000. This they did solely upon the theory that it was

the price paid by plaintiff for the property.   At the time of the arrangement between these two companies, they were and had been for some time competing companies in the business of furnishing water to the city of Oakland and its inhabitants. The deed by which plaintiff acquired the property and business of the other company recited a consideration of $1,500,000, and that the conveyance was subject to a bonded indebtedness in the sum of $1,500,000.   It appears that no money passed in this transaction, the $1,500,000 expressed consideration being paid in stock of the Contra Costa Water Company at its par value.   It was assumed that this stock was worth seventy cents on the dollar, viz.: $1,050,000, and by adding this to the bonded indebtedness of $1,500,000, the values of Mr. Adams and Mr. Schuyler of $2,550,000 are obtained.   This seventy cents on the dollar was the market value of Contra Costa Company stock some few months after the arrangement was perfected, but it had no such market value at the time of the arrangement.   What its value then was does not appear, except that it appears that it was lower than seventy cents, but it is claimed that such lower price was not the fair price. While the price paid for an article is ordinarily some evidence of its value, the evidence of price here is practically worthless.   Regardless of other considerations, it appears that no estimate of the value of the various items composing that property, even including that of Mr. Adams, brought the aggregate higher than about $2,300,000, and the great weight of evidence in number of witnesses, at least, put it even far below the amount of the bonded indebtedness.   (See *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, [29 Sup. Ct. 148, 53 L. Ed. 371].)   Of Mr. Kiersted's testimony as to the value of this property it is sufficient to say that it shows simply a method of arriving at the value which does not appear to us to furnish the least particle of support for any judgment as to the actual value.

"Mr. Kiersted based his conclusion as to the total value of plaintiff's property solely on two methods pursued in determining that value, one of which may properly be called the investment method, and the other the capitalization method. Mr. Adams and Mr. Schuyler also used somewhat similar methods in arriving at a conclusion, as confirmatory of their other method of valuation.   The data upon which all these

calculations were based were very uncertain, in view of the fact already stated that most of the books and records of the Contra Costa Water Company showing details of cost of construction and operating expenses had been destroyed by plaintiff in the year 1899, and to a great extent only certain incomplete memoranda testified to have been taken from the books by the president of the plaintiff, and certain very general statements filed by the company with the city council in the year 1886, and annually since, were available as a basis for the calculations. It was necessary for these witnesses in making their calculations to assume many things for which no basis existed in the evidence. Taking all of the evidence of this character together, it was too uncertain to afford any measure of or guide to the present value of the property.

"The only other expert witness on the part of plaintiff was Mr. Le Conte. He confined himself to estimates of the actual cost of construction, without undertaking to place any value on the aggregate property of plaintiff. If there be deducted from his estimate of actual cost anything like a fair allowance for depreciation, it would be impossible to find in the record a total value of $7,000,000 or anything near that sum for plaintiff's property, based upon Mr. Le Conte's estimate so far as the cost of construction was concerned.

"There is no other evidence in the record that would, taken alone or in connection with such portions of the testimony of the witnesses already named as furnish evidence of the value of plaintiff's property, bring the present value of such property as high as $7,000,000. It is suggested by learned counsel that there are many other elements upon which no value was given by the testimony, that might properly have been taken into consideration, and must be assumed to have been taken into consideration by the trial court in arriving at a conclusion as to value, such as appreciation in value, the skill and good management in the upbuilding of the works, the obstacles and difficulties encountered in the construction of the works, the unusual natural advantages presented by the San Leandro Lake as a source of water supply, the fact that the system of plaintiff had been thoroughly tried and proved equal to all demands, the prospective value of the property, the fact that plaintiff was carrying on its business in the exercise of a franchise emanating from the state, and

the risks of the business.  As to all of these items, regardless of all other consideration, we find no foundation in the record for any additional valuation by the trial court.  The burden of proof as to valuation is on the plaintiff seeking to show the invalidity of such an ordinance as the one we have before us, and he must supply such evidence as will clearly warrant the valuation he seeks to have placed upon his property.  (See *San Diego Water Co.* v. *San Diego,* 118 Cal. 573, [62 Am. St. Rep. 261, 50 Pac. 633, 38 L. R. A. 460].)  A trial court is not warranted in indulging in mere conjectures or surmises as to the value of certain alleged elements, and in basing its conclusion as to the value of the whole property in part thereon.  We are unable to conceive of any proper theory upon which the finding of the trial court as to value can be held to be sufficiently sustained by the evidence.

"As to the facts surrounding the adoption of the ordinance and the contention of plaintiff based thereon, it is necessary to say a few words.  There is no claim, as we understand it, that there was any *actual* fraud on the part of the council, or that the members of the council did not act in good faith and with the belief that they were fixing rates that would insure a fair and just return upon the actual value of plaintiff's property, and the findings do not, as we understand them, intimate anything of this kind.  So far as the findings may imply that the ordinance was passed without any opportunity to plaintiff to be fully heard on the question as to the proper rates to be fixed, we think that the evidence does not support the conclusion.  The time for the annual establishment of rates was fixed by law.  Under the act of March 7, 1881 (Stats. 1881, p. 54), it was the duty of the plaintiff to furnish the council in the month of January with a detailed statement showing the names of water-rate payers during the year preceding, and also 'all revenue derived from all sources, and an itemized statement of expenditures made.'  This statement was furnished.  It was also the right of plaintiff to furnish with such statement, a detailed statement of the amount of money actually expended annually, since commencing business, in the purchase, construction and maintenance respectively, of the property necessary to the carrying on of its business, and also the gross cash receipts annually, for the same period, from all sources.  Plaintiff had the right to

fortify this statement by such explanations and proofs as it might see fit to insert. This was a full and sufficient opportunity to present its case. (*San Diego L. & T. Co.* v. *National City,* 174 U. S. 739, [19 Sup. Ct. 804, 43 L. Ed. 1154].) It may be said that common fairness would demand that plaintiff should be allowed, if it so desired, to supplement its written statement with proof and argument before the council. The evidence shows that such opportunity was accorded it, and that the president of plaintiff appeared before the council in its behalf on two occasions. No request made by plaintiff looking to a further opportunity to present proofs or argument or to be present at any investigation of the council or its committee to which the matter was referred was denied, except the request made after the investigations of the council were completed and the ordinance was about to be voted on. It certainly cannot be held that the refusal of the council to then suspend proceedings and enter into a further investigation, especially upon the very general statement of the president as to what he could show, amounted to a deprival of an opportunity to plaintiff to be fully heard in the matter of the fixing of the water rates, or indicated any unfairness on the part of the members of the council. We are satisfied that the evidence is not sufficient to sustain the conclusion that the rates were established by 'a merely arbitrary conjecture . . . not based on investigation or the exercise of judgment or discretion.' (See *Railroad Commission* v. *Cumberland etc. Co.,* [212 U. S. 414], 29 Sup. Ct. 357, [53 L. Ed. 577].) We are not to be understood by what we have said as intimating that if these findings were sufficiently supported by the evidence it could make any difference in our disposition of this appeal, in the absence of a finding as to value sufficiently sustained by the evidence. We are satisfied that all of the other findings in this connection are immaterial on this appeal, in view of our conclusion that the finding as to the value of plaintiff's property is not sustained by the evidence. In the absence of a finding on that question, we cannot determine that the compensation afforded by the ordinance is not a just and reasonable compensation, and if the compensation afforded be just and reasonable, plaintiff cannot complain in the courts as to the methods used by the council in arriving at the conclusion embodied in the ordinance. We cannot do better than to quote

what was said by Judge Farrington in this connection, in *Spring Valley Water Company* v. *City and County of San Francisco*, [165 Fed. 676]: 'This case comes here on one vital issue, Are the water rates confiscatory? To this all other questions involved are mere incidents. If the water rates in question are confiscatory, then the ordinance is repugnant to the federal constitution, and must be pronounced invalid. Its invalidity cannot be healed by showing the supervisors were actuated by the purest motives, that they committed no error in applying the law to the facts, and that their deliberations were conducted in strict obedience to the rules which govern courts in the administration of justice, and in the admission and rejection of evidence. But, on the other hand, if it appears that the rates will afford complainant a just and reasonable compensation for the use of its property, the ordinance is not repugnant to the constitutional provision invoked, because it does not deprive the company of anything whatever. And this is so even though it be shown that the board in its proceedings violated every rule in the law of evidence. The rates are either just and reasonable or unjust and unreasonable, and that fact must be ascertained by this court from its own independent investigations, and not from a review of the proceedings before the board of supervisors to ascertain whether it erred in the admission or rejection of testimony, or whether, on the testimony before that body, it should have arrived at a different conclusion.' We have already quoted from Justice Van Fleet in *San Diego Water Co.* v. *San Diego,* 118 Cal. 573, [62 Am. St. Rep. 261, 38 L. R. A. 460, 50 Pac. 633], as to the function of the courts in cases of this character, as follows: 'All that they have to consider is, whether, in a given case, the result of the council's action will be to take the property of the complaining party without just compensation.' Indeed, we do not understand learned counsel for plaintiff to claim that they are entitled to any relief in the courts as against the ordinance, unless the rates fixed are unreasonable and unjust, and amount, legally, to a confiscation. We do not read the opinion in *Spring Valley Water Co.* v. *San Francisco,* 82 Cal. 286, [16 Am. St. Rep. 116, 6 L. R. A. 756, 22 Pac. 910, 1046], or the opinion of Judge Van Fleet in *San Diego Water Co.* v. *San Diego,* 118 Cal. 573, [62 Am. St. Rep. 261, 38 L. R. A. 460, 50 Pac. 633], as declaring a contrary view."

There are many other matters discussed in the briefs, but we do not deem it necessary for the disposition of this appeal to consider any of them.

This is adopted as the opinion of the court on this hearing.

The judgment and order denying a new trial are reversed.

Shaw, J., Sloss, J., and Allen, J., *pro tem.,* concurred.

CHIPMAN, J., *pro tem.,* dissenting.—I am unable to agree with the majority opinion. In the consideration of the evidence to determine whether it is sufficient to support the findings, I can see no reason why any different rule should be applied from that governing cases generally coming here on appeal—i. e., that if there is any substantial evidence to support any particular finding, for example, the valuation of plaintiff's property, it must stand and will not be overthrown because there may be apparently a preponderance of evidence to the contrary. The rule is well established and necessarily it can admit of no exception without violating the constitutional provision which leaves with the jury or the trial court the determination of all questions of fact. It seems to me that if the majority opinion had been written with due regard for this rule a different conclusion would have been reached upon the vital question, to wit, the valuation of plaintiff's property devoted to the public use.

When, however, the conclusion was reached that there was not sufficient evidence to justify the finding of seven million dollars as the valuation, there was then determined, as the opinion justly observes, that there existed no "foundation upon which to rest a conclusion as to the sufficiency of the compensation that will be given by the rates fixed, . . . for we would then be without any finding on the question of value, and without any power or ability to supply such finding." This conclusion reached, it seems to me, the case was practically ended and the reversal of the judgment would necessarily follow. If, however, there was not sufficient evidence to justify the finding of valuation, this court is not authorized to search for evidence in the record to find support for some different and lower valuation of plaintiff's property in order to determine the reasonableness or unreasonableness of the ordinance complained of, for I do not understand that we can make findings of fact for any purpose. Neither have

we the right to say that the evidence justifies any given valuation, and no more, for to do this is both to pass upon questions of fact and to prejudge the case upon a retrial which the reversal of the judgment requires must take place. The argument upon this point has been addressed wholly to the question —Does the evidence sustain the finding of valuation as fixed by the trial court? Before this court can properly take up the question of some different valuation there should be a trial of that question and a finding by the trial court which alone can make findings of fact.

In order to reach the conclusion that there was evidence justifying a valuation of three million five hundred thousand dollars and hence the rate fixed was not confiscatory because it would, at that valuation, yield an income of $4\frac{1}{2}$ per cent, it became necessary to violate the rule first above stated, whereas, I think, the conclusion, if the court is to enter upon so delicate and dangerous a field of inquiry at all, should have been drawn from such substantial evidence as might be found in the record, whether or not in conflict with other evidence. Had this been done, in my opinion, a much larger valuation than three million five hundred thousand dollars would have found ample justification. The income increases proportionately with the increase of the valuation, the rate being fixed, and hence the importance of ascertaining, in a spirit of fairness to plaintiff, the full reasonable value of its property, taking into account every element which justly enters into such value.

If there were elements of value admitted in evidence in support of the finding adverse to defendants, and against their objection, this court may properly decide whether or not error was committed, in the particular assigned as error. Such is one of the legitimate functions of an appellate court and is exercised as a guide to the trial court upon the retrial of the case as well as to the rate-making body. But to sum up the result of the evidence, independently of the finding of the trial court, and make a finding of the value of plaintiff's property for the purpose of passing upon the reasonableness or unreasonableness of the ordinance is, in my judgment, an assumption of the prerogative of the trial court, and besides, it can be of little value, for the evidence may not be the same upon a retrial.

If there is to be an end to litigation growing out of rate fixing by the rate-making board and successive appeals are to be avoided, this court should, so far as possible, indicate what in its opinion constitute the elements to be considered in ascertaining the value of the property devoted to the public use. No court, so far as I have found, has undertaken to catalogue all these elements or precisely delimit what are and what are not proper to be considered. Some of these, however, have been named as just and proper and should enter into the calculations of the rate-making body. The original cost of construction of the plant, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present compared with the original cost or construction, the probable earning capacity of the property under the particular rates prescribed by statute or ordinance, and the sum required to meet operating expenses, while there may be others, are all matters for consideration and are to be given such weight as may be just and right in each case. (*Smyth* v. *Ames,* 169 U. S. 466, [18 Sup. Ct. 418, 42 L. Ed. 819].)

Appreciation in value is an element to be considered, for there is no reason why a public service corporation should not enjoy the same advantage of enhanced value as is enjoyed by the owners of other property which has been made more valuable by the service given it by the corporation or which in turn, by becoming more valuable, has added new value to the public service plant. Ordinarily all properties of the community enhance in value *pari passu* and insofar as this enhanced value attaches to the property of the public service company it becomes a factor in fixing the value for rate-making as well as for any other purpose. (*Metropolitan Trust Co.* v. *Houston etc. R. R. Co.,* 90 Fed. 683, 687; *Cotting* v. *Kansas City Stock Yards Co.,* 82 Fed. 850.) Speaking of property affected with a public use, the court said, in *San Diego* v. *National City,* 74 Fed. 79: "If it has since enhanced in value, those who invested their money in it, like others who invest their money in any other kind of property, are justly entitled to the benefit of the increased value."

The courts also take cognizance of the element of skill and good management which has contributed to the upbuilding of the enterprise in question. Most public service works are the growth of years of constant changes and development, and,

we may safely say, for the enhancement of their usefulness and value. Foresight, intelligent management, and special skill, exceptionally adapted to the work in hand, are required and must be taken into account. Speaking of the persons engaged in these enterprises, the court said, in *Brunswick & T. Water Dist.* v. *Maine Water Co.,* 99 Me. 371, [59 Atl. 537, 540] : "To be successful, they must be wise and prudent, thrifty and energetic. These virtues, if they have them, they impress upon the property, making it more valuable than it otherwise would have been. Is it to be said that they can have no return for skill and good management? We do not think so."

ᵀn the decision of the Interstate Commerce Commission, entitled—"Reproposed Advance in Freight Rates" (1902), 9 Interstate Commerce Com. Rep. 381, 402, it was said: "Moreover, the value of a railway system does not depend upon the mere cost of its embankment or its equipment. It is rather a question of location, of connections, of terminal facilities, of enterprises along its line; and shall nothing be allowed to the foresight and ability which have marked out and perfected that system?"

The evidence showed that plaintiff had encountered and successfully overcome serious difficulties and obstacles in perfecting its system of "which a casual inspection of the works as they now exist gives a very faint idea." An unusual advantage as a source of water supply is the San Leandro Lake, which supplies a large proportion of the water supplying the city of Oakland, and the permanency and reliability of the sources of supply by this and other means should be considered. Speaking of these, one of the witnesses testified: "There are two sources of water supply owned by the company that are deemed of great value in the open market—San Leandro Lake, and that pumped from underground sources at Alvarado. The latter is, of course, included in the purchase price of the Oakland Water Company's plant. The former has been developed at great expense from unusual natural advantages improved by works of great stability and permanency. It represents a property that could not probably be duplicated at equal cost on any other site within many miles of Oakland." The evidence showed that the plant is in no sense experimental but has been thoroughly tested and

found equal to all requirements and of tried stability, and this is, as the witness said, "a very important factor in considering relative values of existing properties and properties that are yet uncreated," as any new waterworks would be if built to supplant the present one. These elements, as are others not mentioned, are in a large degree intangible, the value of which in money it is difficult to estimate but which may and should be considered in fixing the value of plaintiff's plant and no doubt entered into the calculation made by the trial court, a fact to which the majority opinion seems not to have given due importance.

Then there are the risks of the business to be considered for, as was said in *San Diego Water Co.* v. *San Diego,* 118 Cal. 556, [62 Am. St. Rep. 261, 38 L. R. A. 460, 50 Pac. 633]: "This is not an ordinary business enterprise. Those who engage in it put their property entirely into the hands of the public. Having once embarked, it is beyond their power to draw back. They must always be ready to supply the public demand, and must take the risk of any falling off of demand." There are other risks to which the enterprise is liable; it must submit to regulation of rates which may be arbitrarily or unjustly fixed, requiring resort to the courts for relief; it is subject to condemnation by the municipality and although presumably it would be paid full compensation, it would be a risk in some measure affecting the value for rate making; there are also dangers of loss from earthquake and flood. The value of the tangible property is doubtless the basic element in the inquiry but clearly there are many others to which consideration must be given and no doubt was given by the trial court, and this it was its duty to do although the evidence named no specific amount as the value of these elements.

Still other elements may be mentioned which enter into any fair consideration of value. "The value of the service which the public receives is also an element to be determined in considering whether the rates are reasonable." (*Redlands etc. W. Co.* v. *Redlands,* 121 Cal. 365, 371, [53 Pac. 843]; *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, [19 Sup. Ct. 804, 43 L. Ed. 1154].)

That plaintiff is a going concern is an important element, the value of which witnesses fixed at five hundred thousand dollars, but this item is disregarded in the principal opinion

because the value placed upon it by the witnesses, like that of the value of the franchise, was not thought to rest upon any sufficient basis. The opinion states that because the value of the going business and franchise depends upon their earning power, which in turn "depends upon rates to be fixed annually by the city council in such a way as to give only a fair return on the property in use, and the franchise is neither exclusive nor defined by any special contract with the city, these elements would appear to play a very small part, if any, in the matter of valuation." In effect the opinion eliminates both of these elements from any consideration in arriving at the value of plaintiff's property and would warrant their exclusion in any further hearing of the matter. The reasons given for this conclusion are, to my mind, inconclusive and furnish no ground for their elimination altogether as elements of value. It cannot be fair or just to reduce the valuation of the property because of the fact that the council may fix the rates annually, for that would make the rate govern value whereas value should govern the rate, i. e., the rate should always be governed by the principle that the public service corporation is entitled to be allowed to charge a rate which would yield a just and reasonable income based upon the full reasonable value of its property.

Nor should the fact that the franchise is not exclusive or defined by any special contract take from it all value. The view of the majority opinion, on the question of going concern, seems to be derived from the Consolidated Gas Company case, of New York City ([212 U. S. 19], 29 Sup. Ct. 192, [53 L. Ed. 382]), where the court placed its opinion largely upon the assumption that the gas company was a monopoly and "that it is not a case for a valuation of *'good will.'*" That the gas company was a monopoly was assumed from the further assumed fact that the city would not be likely to ever allow its streets and alleys to be disturbed in competition with the established company which had occupied every available space in building and extending its plant. No such assumption can be here indulged. Much testimony was taken to show that another system of supplying the city of Oakland could be built and that the city had the right to build it. Is the city to be allowed to beat down the valuation of a going business by menacing it with threatened possible competition? In the

very recent case, decided April 10, 1910, by the United States supreme court—*City of Omaha* v. *Omaha Water Co.*, 218 U. S. 180, [30 Sup. Ct. 615, 54 L. Ed. 991], this question is considered. The city of Omaha resolved to exercise its option to purchase defendant's plant, under legislative authority. The court said: "The option to purchase excluded any value on account of unexpired franchise; but it did not limit the value to the bare bones of the plant, its physical properties, such as its lands, its machinery, its water-pipes or settling reservoirs, nor to what it would take to reproduce each of its physical features. The value, in equity and justice, must include whatever is contributed by the fact of the connection of the items making up a complete and operating plant. The difference between a dead plant and a live one is a real value, and is independent of any franchise to go on, or any mere good will as between such a plant and its customers. That the kind of good will, as suggested in *Wilcox* v. *Consolidated Gas Co.*, 212 U. S. 19, [29 Sup. Ct. 192, 53 L. Ed. 382], is of little or no commercial value when the business, as here, is a natural monopoly, with which the customer must deal, whether he will or no. That there is a difference between even the duplication, less depreciation, of the elements making up the water company plant, and the commercial value of the business as a going concern, is evident." Citing *National Water Works Co.* v. *Kansas City*, 62 Fed. 855, 27 L. R. A. 827, 10 C. C. A. 655, 27 U. S. App. 165. In the cited case, Mr. Justice Brewer said: "A completed system of waterworks, such as the company has, without a single connection between the pipes in the streets and the buildings of the city, would be a property of much less value than the system connected as it is, with so many buildings, and earning, in consequence thereof, the money which it does earn. The fact that it is a system in operation, not only with capacity to supply the city, but actually supplying many buildings in the city,—not only with a capacity to earn, but actually earning,—makes it true that 'the fair and equitable value' is something in excess of the cost of reproduction. . . . It should pay, therefore, not merely the value of a system which might be made to earn, but that of a system which does earn." I venture to suggest that "good will" is to be distinguished from what is meant by the term "going business." "Good will," said Lord Eldon, "means noth-

ing more than the probability that the old customers will resort to the old place." Words and Phrases, Title "Good Will." "Going business or concern" is a term applied to a corporation which is "still prosecuting its business with the prospect and expectation of continuing to do so, even though its assets are insufficient to pay its debts." (*Corey* v. *Wadsworth*, 99 Ala. 68, [42 Am. St. Rep. 29, 11 South. 350, 353; 23 L. R. A. 618].) When applied to a corporation it "means that it continues to transact its ordinary business." (*White etc. Mfg. Co.* v. *Pettus Importing Co.*, 30 Fed. 864, 865.) Words and Phrases. Here is a duly organized corporation with an established business in full operation and likely to continue for an indefinite period. If its property was being condemned, the Omaha case is authority for holding that the "going business" is an asset of value to be considered. For the purposes of rate-making I am unable to see why it is not a proper and necessary factor. Any element that goes to enhance the legitimate value of plaintiff's plant is part of its property rights and must be taken into account in ascertaining the total value of its property.

After showing, from the point of view taken of the evidence by the majority opinion, that a valuation of three million five hundred thousand dollars might find support "over operating expenses and taxes; and after deducting for depreciation what is assumed as one per cent of the value of the perishable and non-perishable property, the opinion proceeds: 'In that event, we would have over four and one half per cent (the excess would be very slight) net for the stockholders. This certainly would be a very substantial net return, considerably more than is derived from many investments eagerly sought by capital. We do not wish to be understood as intimating that even such a return would be considered by us as a full and fair return under all the circumstances, were we engaged in the exercise of the legislative power of fixing the rates. That, as said before, is not a function of the courts. We simply mean that we do not believe it to be so low, under the circumstances appearing here, as to warrant a court in holding it to be beyond the legislative power to fix.'"

The opinion holds that the evidence presented in the 5,500 printed pages "would have supported a value of not exceeding $3,500,000.00," from which must be deducted something

for depreciation. The case seems to have been exhaustively tried on all questions of law and facts. Whether on a retrial plaintiff's case may be strengthened I know not. But as it stands, this court, by a majority, holds that unless strengthened no greater amount than three million five hundred thousand can be supported, and this amount must be diminished by depreciation. As already suggested, I think the court should not thus forestall and prejudge the findings to be made upon a retrial. And the reason given in the opinion for discussing the question does not seem to me satisfactory,— namely: "We have said this much for the purpose of showing that the judgment cannot stand if the finding of the trial court as to the value of plaintiff's property is not sufficiently sustained by the evidence." As heretofore remarked, there has been no fair opportunity given plaintiff to show that the evidence would justify a finding of something, and it may be but little less than seven million dollars, which, in my opinion, should first be passed upon by a trial court, either on the evidence presented by this record or such additional evidence as may then be submitted. The conclusion reached by the majority of the court, I am satisfied, leaves out of its consideration elements of value which the trial court properly included and which materially affected its conclusions.

There was much evidence directed to the question—What would have been a reasonable per cent, when the ordinance was passed, to allow as income based upon the valuation of the property, exclusive of operating expenses and taxes? It was shown in many different ways, which need not be enumerated, that seven per cent was a reasonable rate; that ordinary investments upon security absolutely safe, such as government bonds, mortgages and the like, yielded six per cent. The cases hold that stockholders in water companies are entitled to receive a rate of interest in excess of that which would be considered reasonable where the loan is free from risk. The cases are cited in the briefs and are conclusive upon the point.

In *San Diego Water Co.* v. *San Diego,* 118 Cal. 556, 570, [62 Am. St. Rep. 261, 38 L. R. A. 460, 32 Pac. 633], this court held that in the ascertainment of the rate of interest which should be allowed, comparison should be made between the company's business and other kinds of business involving a similar degree of risk. Chief Justice Beatty, in that case,

stated what he regarded and what I think the company is entitled to,—namely, "rates ought to be adjusted to the value of the service rendered, and this means that the water company should be allowed to collect annually a gross income sufficient to pay current expenses, maintain the necessary plant in a state of efficiency, and declare a dividend to stockholders equal at least to the lowest current rates of interest, not on the par or market value of the stock, but on the actual value of the property necessarily used in providing and distributing the water to consumers." Even now when money is "easier" and rates of interest less than in former years—say ten years ago when this ordinance was passed—the current rate on undoubted security is six per cent. How, then, can it be justly said that 4½ per cent to the stockholders "would be a very substantial net return, considerably more than is derived from many investments eagerly sought by capital?" This may be true of surplus capital held "on call" in safe hands, or of trust funds where absolute security is the prime consideration, but it is not true of investments similar to the one here, nor is it true of ordinary, current loans in business enterprises.

Neither am I willing to subscribe to the proposition that the rate-making authority may, with the sanction of this court, adopt 4½ per cent as a reasonable rate of net income to the company, while at the same time informing that body that "we do not wish to be understood as intimating that even such a return would be considered by us as a full and fair return under all the circumstances, were we engaged in the exercise of the legislative power of fixing rates." This may be a salve to the consciences of the court but it is tantamount to saying to the rate-making body—The courts will not disturb your ordinances so long as you provide an income to plaintiff equal to 4½ per cent upon the value of its property, although we think it unreasonable; and it is quite probable that a body acting for the consumers and deriving its life from them, would not be likely to allow any greater rate.

And this leads to the question—What is the function of the trial court in passing upon the reasonableness or unreasonableness of a rate-fixing ordinance? The opinion says it is not the function of the court to fix the rate, as that is purely a legislative function. In the sense that the court may not fix

a rate and order the legislative body to adopt it, the proposition is correct. In its decree the trial court did not direct the council to provide for seven per cent income over and above plaintiff's operating expenses and taxes. In one of its findings it did, however, upon sufficient evidence, express the opinion that "a just and reasonable rate for the water to be so supplied is seven per cent of said sum of $7,000,000.00, over and above the expenses and taxes hereinafter mentioned; and plaintiff is entitled to receive for the water which will be supplied by it . . . at least seven per cent upon said $7,000,000.00 over and above and in addition to its operating and other expenses," etc. It is well settled that the lower court had the authority to determine whether or not the rates fixed by the council were reasonable. Incidentally to this inquiry it was within the power of the court to say what is a proper charge. The council is entitled to know what the court would regard as unreasonably low and, in determining what rate would be unreasonable, the court must have some standard by which to govern its action, some rate which may be brought into comparison with the rate allowed by the ordinance, without which I can conceive of no criterion to control its decision. In the case here the evidence fully sustained the conclusion of the trial court. But even so, the decree directed the council to so fix the rates as to "afford to plaintiff a just and reasonable compensation for the service rendered and the water supplied, and as will yield a sufficient income to pay its expenses and taxes, and a reasonable rate of interest upon the value of plaintiff's property," etc.; and further, to fix the rates "in accordance with the principles established in this decree." I do not understand that the council was directed to do more than fix a reasonable and just rate, guided, it may be, though not compelled to adopt what the court named as a reasonable rate.

Some writers have spoken of a "twilight zone of injustice" in which the legislative body may roam at will in fixing rates and, while acting in this unilluminated region, the courts are powerless to control its judgment. That is, as intimated in the majority opinion, that the council may adopt a rate which the court would not, if sitting as a legislative body, regard as reasonable, and yet, sitting as a court, it cannot say is unreasonable. If there is warrant in reason for such a doctrine, the court should at least place some sort of limit to this field

in which the rate-making body may exercise an uncontrolled discretion. It is within the proper and rightful exercise of its functions for the court to say to the legislative body that any rate which fails to measure up to what the court may declare to be reasonable compensation would be void as unreasonable, and, in my judgment, it is competent for the court, in view of all the circumstances, to say what this minimum should be, having reference to the nature and character of the service to be rendered. How can this court consistently say that 4½ per cent is not "a full and fair return under all the circumstances" and yet, in view of the evidence, say that 4½ per cent would be "a very substantial return, considerably more than is derived from many investments eagerly sought by capital?" Apparently, this "twilight zone" has a range of 2½ per cent below what the evidence showed would be a reasonable rate. This is altogether too wide a range of discretion.

Expert witnesses, in placing a value upon the San Leandro Lake, based their valuation upon "the miner's inches of water under a four-inch pressure practically constant and certain yielding capacity," at twenty-five hundred dollars per inch. Whether this was too high a value it is not within our province to determine. As a fair and legitimate method of ascertaining the value of this reservoir, however, I have no doubt. In many parts of the state the value of water is thus ascertained. The majority opinion seems to discredit it.

Finally, in the opinion prepared on rehearing, the court says: "If the rates fixed yield less than the lowest per centage of profit which is ordinarily obtained in the locality upon equally safe and permanent investments in enterprises of a kindred character, the regulation is as clearly confiscatory as if no return at all is provided upon a portion of the property actually employed." Applying this rule to the evidence before us, I am clearly of the opinion that the rates fixed by the council are confiscatory. Nor can I reconcile the above rule with subsequent portions of the majority opinion which holds that 4½ per cent is not confiscatory, for the evidence would warrant our holding that six per cent "is the lowest percentage of profit which is ordinarily obtained in the locality upon equally safe and permanent investments in enterprises of a kindred character."

Justices Henshaw and Melvin being disqualified and unable to act in this cause, Hon. N. P. Chipman, presiding justice of the district court of appeal for the third appellate district, and Hon. M. T. Allen, presiding justice of the district court of appeal for the second appellate district, were selected by the remaining justices of this court to act *pro tempore,* in the consideration and decision of this cause and until the decision therein becomes final.