[S. F. No. 12714. In Bank.—March 26, 1928.]

In the Matter of the Controversy Without Action Between JOHN COLLIER, Appellant, v. FRANCIS H. LINDLEY et al., Respondents.

Alan H. Critcher for Appellant.

Louis de F. Bartlett and J. Wiseman Macdonald for Respondents.

RICHARDS, J.—This proceeding has arisen out of an endeavor on the part of John Randolph Haynes and his wife, Dora Haynes, to procure a final ruling of the courts

upon the validity, in whole or in part, of a certain trust sought to be established by them and each of them under the name of "The John Randolph and Dora Haynes Foundation." The method employed to secure such ruling is to be found in the terms of a clause in the document whereby said trust was sought to be created and which reads as follows:

"Paragraph Sixteenth: In the event that this instrument does not create a valid, charitable trust, or, if it be finally adjudicated that any purpose set forth herein be invalid, the sum of five hundred dollars ($500.00) out of the *corpus* of the estate, shall belong to, and be forthwith paid to John Collier."

The present litigation was initiated in the superior court in and for the county of Alameda in the form of a proceeding instituted by the said John Collier under the provisions of sections 1138, 1139, and 1140 of the Code of Civil Procedure, which provide for the submission of controversies without action upon agreed facts for the purpose of procuring a declaratory judgment thereon. It nowhere appears from the record herein that John Collier, the institutor of this proceeding, is related to the creators of said purported trust, or is in anywise interested in the *corpus* or carrying into effect thereof except as to that relationship or interest which exists by virtue of the provisions of the foregoing clause in said document. An examination of the above quoted clause will show that said John Collier was not by its terms required to institute or to defend any action or proceeding begun by those directly interested therein for the purpose of having said purported trust declared to be valid or invalid, or to enforce any of the other terms or provisions thereof. He is, in short, required to create no controversy and to perform no service whatever in order to be entitled to receive and to have judgment for the sum of $500 to be paid him as provided therein. The provision for the payment to him of the sum of $500 conditioned upon said trust or some portion thereof being invalid is nothing more nor less than a thinly veiled attempt to engage the attention and compel the labors of the several courts of record of this state in order to effectuate a judicial determination of the validity or invalidity of said trust at once and in advance of any real contest or controversy between the parties in

interest therein over its properties or provisions, and as such we hold it to be in plain violation of the spirit and intent of the sections of the Code of Civil Procedure above referred to, as well as of the general principle that courts should only be employed in the adjudication of actual as distinguished from moot questions and controversies when these are brought before them in the regular and orderly course of litigation by those parties only who are directly interested in their adjudication. ▇▇ We therefore unreservedly disapprove the insertion in documents or agreements of clauses of the character and intent of that above quoted, which have for their manifest purpose that of inviting and encouraging litigation in regard to matters with relation to which no real cause of action has arisen; and in the instant case we would have no hesitation in carrying our aforesaid disapproval to the extent of ordering a dismissal of this appeal but for the fact that there are certain questions of public interest which are involved therein and which arise entirely apart from the interest of the parties to the immediate proceeding.

The document by the terms of which John Randolph Haynes and his wife, Dora Haynes, have undertaken to create and to devote certain of their properties to sustain a trust under the title of ''The John Randolph and Dora Haynes Foundation'' is before us, and the substance and terms thereof, after the recitals of the properties to be allocated thereto and the trustees to be invested therewith, reads in part as follows:

''Paragraph Sixth: The trustees shall hold the said trust estate in trust for the following uses and purposes:

''Sec. I. To promote and assist in promoting and obtaining, maintaining and making improvements in the structure and methods of government, national, state and/or local, by obtaining, protecting, preserving, and/or furthering, by any or all legitimate ways,

''(a) The public ownership and operation of public utilities.

''(b) Direct legislation, now known as the Initiative, Referendum and Recall.

''(c) Such improvements in the direct, popular nomination and election of public officials as will enable the electorate to vote more intelligently and efficiently; simplify

nomination and election procedure; and insure a more adequate representation in government of the important groups.

"(d) Assisting in the making, amending, and/or reviewing of city charters, county charters, and State and national constitutions.

"Sec. II. (a) To improve living conditions of the working people by investigating the causes of poverty, preventing the operation of such causes, and remedying or ameliorating the conditions resulting therefrom, by any legitimate means.

"(b) To study, investigate and encourage, the introduction into the United States of America of the cooperative system of selling and purchasing food, household and other requirements, under the system generally known as the 'Rochdale System of Cooperation.'

"Sec. III. To improve working conditions for men, women and children by:

"(a) Investigating the causes of industrial accidents and diseases; including, among other things, the relation of hours of labor to the health of workers, and the conditions under which work is performed;

"(b) Helping, by all lawful means, to prevent the continuance of conditions inimical to the health, welfare and safety of workers, and helping to secure better working conditions for them.

"Sec. IV. To induce, encourage and support industrial cooperation, to the end that justice may be done to employer and employee alike, and harmony be established and maintained between them, and industrial hatred and strife abolished, thereby benefiting mankind in general.

"Sec. V. To encourage and give educational opportunities for the study of—

"(a) Governmental problems and reforms furthering 'Government of the people, by the people, and for the people';

"(b) Industrial problems with special reference to improvements in living and working conditions of the working people;

"(c) Social problems with special reference to improvements in health, sanitation and morals of the working people,

by paying wholly, or partially, lecturers and instructors on matters included in this Section V, and/or by furnishing appropriate books and literature on these matters, and/or by donations to institutions or organizations to be applied in furthering the causes in this section designated, and/or by assisting in obtaining or supporting, or helping to enforce legislation for such purposes, or any of them.

"Sec. VI. To further the improvement of the human race by aiding and encouraging the science of eugenics, which deals with the heritable qualities of the human race; and by aiding and encouraging the practicable application of the principles of that science.

"Sec. VII. To assist in securing, maintaining, enforcing and strengthening prohibition and other legislation, national, state and/or local, affecting the manufacture, and use and/or disposition of alcoholic beverages and/or intoxicating liquors and/or narcotic drugs by all lawful means and/or by investigating the operation and enforcement of laws and ordinances relating to those questions, and the results flowing therefrom.

"Sec. VIII. To promote justice for the American Indian in the United States by assisting in procuring legislation and/or by stimulating the proper enforcement of legislation to that end, and/or by assisting individual, or bodies of, Indians in obtaining that justice.

"Sec. IX. To assist in preserving and strengthening the rights of the citizens of The United States to 'Freedom of speech . . . and peacefully to assemble, and to petition the government for redress of grievances,' by donations to particular institutions or bodies, operating wholly or partially, permanently, or temporarily, for those purposes.

"Paragraph Seventh: In properly carrying out and aiding all and any of the purposes and objects of the Trust, the Trustees in general shall have full power and authority:

"Sec. I. To employ and pay attorneys, lecturers, writers, investigators, and such assistants and employees of every kind as they may deem necessary.

"Sec. II. To buy, print, publish, and/or distribute, by mail or otherwise, to whom they may think proper, appropriate pamphlets, cards, notices and information;

"Sec. III. To buy and distribute, by mail or otherwise, to whom they may think proper, copies of appropriate newspapers, magazines and books.

"Sec. IV. To disseminate by all lawful means, such information as in the judgment of the trustees may be useful in carrying out the purposes of this Trust.

"Sec. V. To draft and/or assist in drafting, appropriate bills and acts, laws, and other proposed legislation, and use all lawful means to have them introduced, passed, made effective, and enforced."

The trust thus sought to be created is in perpetuity to the trustees designated in the document establishing the same and to their successors to be chosen in the manner therein provided. The amount and value of the property with which the trustees are to be thus invested is but a comparatively small portion of the estate and properties of the creators thereof, and it is not for that reason objectionable to the provisions of law limiting the amount of a testator's or trustor's property which may be devoted to charitable uses. The immediate questions which are therefore presented to us for determination are as to whether the transfer of the properties set forth in said document to trustees in perpetuity for the advancement of the purposes which are set forth with so much detail in the foregoing excerpts from said instrument, or any considerable portion of such purposes, is void as in violation of the constitution and laws of this state against perpetuities.

■ The constitution of this state provides in section 9 of article XX thereof that, "No perpetuities shall be allowed except for *eleemosynary* purposes." The term "eleemosynary" as thus used in the constitution has been held to be synonymous with "charitable" as used and understood in treaties and decisions upon the subject of trusts (*Estate of Sutro,* 155 Cal. 727, 734 [102 Pac. 920]; *Estate of Cogswell,* 113 Cal. 129 [35 L. R. A. 269, 45 Pac. 270]), and in the last-above cited case the term "charitable trust" is defined to be "a donation in trust for promoting the welfare of mankind at large, or of a community, or of some class forming a part of it, indefinite as to numbers and individuals. ■ It may, but it need not, confer a gratuitous benefit upon the poor. It may, but it need not, look to the care of the sick or insane.

It may, but it need not, seek to spread religion or piety. Schools and libraries, equally with asylums, hospitals, and religious institutions, are included within its scope. It is impossible to enumerate specifically all purposes for which an eleemosynary trust may be created. The difficulty is inherent in the subject matter itself. With the progress of civilization new needs are developed, new vices spring up, new forms of human activity manifest themselves, any or all of which, for their advancement or suppression, may become the proper objects of an eleemosynary trust.'' In the case of *People* v. *Dashaway Assn.*, 84 Cal. 114 [12 L. R. A. 117, 24 Pac. 277], it was said by this court that, ''The enforcement of charitable uses cannot be limited to any narrow and stated formula. As has been well said, it must expand with the advancement of civilization and the daily increasing needs of men. New discoveries in science, new fields and opportunities for human action, the differing condition, character, and wants of communities and nations, change and enlarge the scope of charity, and where new necessities are created new charitable uses must be established. The underlying principle is the same; its application is as varying as the wants of humanity.'' ▮ With the foregoing broad interpretation of the term ''charitable uses'' in mind, let us turn to the declared purposes embraced in the trust to be considered in the instant case. These have above been stated at length, but have been more briefly summarized by the respondents herein (and which summary the appellant herein admits in the main to be correct) to be as follows:

''I. Promoting and assisting in promoting improvements in the structure and methods of government in the United States.

''II. Improving living and working conditions for the working people.

''III. Improving the economic conditions of the country.

''IV. Assisting cooperation between employer and employee.

''V. Assisting education.

''VI. Aiding the practicable application of the science of Eugenics.

"VII. Strengthening of prohibitive legislation affecting intoxicants and narcotics.

"VIII. Promoting justice for the American Indians.

"IX. Preserving the right of free speech and assembly."

The appellant herein does not seriously contend that the foregoing *résumé* of the purposes for which the present trust is sought to be created does not bring it generally within the scope of charitable uses as defined in the foregoing decisions of this court. This being so, it is unnecessary to make more than a passing reference to such cases as *Jackson* v. *Phillips,* 14 Allen (96 Mass.), 539, upon which the appellant herein mainly relies, and which was decided in 1867, interpreting a trust attempted to be created by will in 1861, and which had for its purposes the creation of "a public sentiment that will put an end to human slavery in this country" and also "to secure the passage of laws granting women . . . the right to vote, to hold office, to hold, manage and devise property and all other civil rights enjoyed by men." As to the first of these declared purposes the Massachusetts supreme court held the trust to be valid, but as to the second invalid. The passing of the epoch in which this decision was written has caused its language to have little relation to social problems and its conclusions touching the political and other rights of women to be widely dissented from in later decisions from other jurisdictions. The trend of modern authority has been toward the upholding of trusts which have for their object the creation of a more enlightened public opinion, with a consequent change in laws having to do with human relations and rights in a republic such as ours; and hence it is that bequests of money to trustees for the attainment of woman's suffrage and other rights in the United States have been upheld. (*Garrison* v. *Little,* 75 Ill. App. 402.) Trusts for the promotion of prohibition have been sustained. (*Haines* v. *Allen,* 78 Ind. 100 [41 Am. Rep. 555].) Trusts for the distribution of Henry George's "Progress and Poverty" and "Problems of the Times" have been approved. (*George* v. *Braddock,* 45 N. J. Eq. 757 [14 Am. St. Rep. 754, 6 L. R. A. 511, 18 Atl. 881].) The most recent decision dealing generally with the matter of promoting improvement in the structure and methods of government

is to be found in the case of *Taylor* v. *Hoag*, 273 Pa. 194 [21 A. L. R. 946, 116 Atl. 826], wherein the supreme court of Pennsylvania upheld a trust whereby the net income of the sum of $150,000 was to be devoted "to promote improvements in the structure and methods of government, with a special reference to the initiative, referendum and recall; proportional representation; preferential voting; ballot reform; the simplification of municipal, state and national government and the revision and remaking of city charters, state constitutions and our national constitution with a view to promote efficiency and popular control of government." Following a review of the foregoing cases the court says: "We are led to conclude that a trust for a public charity is not invalid merely because it contemplates the procuring of such changes in existing laws as the donor deems beneficial to the people in general or to a class for whose benefit the trust is created. To hold that a change in a law is in effect an attempt to violate that law would discourage improvement in legislation and tend to compel us to continue indefinitely to live under laws designed for an entirely different state of society. Such view is opposed to every principle of our government based on the theory that it is a government 'of the people, by the people and for the people,' and fails to recognize the right of those who make the laws to change them at their pleasure when circumstances seem to require. With the wisdom of the proposed change the courts are not concerned." The reasoning of the foregoing decision, while it is referable more especially to proposed reforms in legislation, is equally applicable to such social and economic changes as would in the opinion of the donors tend to bring about a more harmonious relationship between employers and employees, or ameliorate conditions among the so-called "working classes," or achieve a more equitable distribution of the fruits of production, or improve the status and condition of any particular race or class of our citizenship or population. The ideas of the creators of the trust along these several lines may be altruistic to the point of seeming to be impractical or even foolish, but it does not follow that the trust would for that reason, if otherwise unobjectionable from the viewpoint of ethics or morals, be invalid. As it is tersely but truly said in Zollman on Charities, at page

149, "a charitable gift may be both absurd and valid." It is our conclusion from an examination of the foregoing summary of the purposes which the creators of this trust had in mind in its formation that there is nothing in any of them which contravenes either public policy or public morals, and that in so far as the purposes themselves are concerned we can find no reason for holding all or any of them to be invalid.

The main attack which the appellant makes upon this trust is not so much upon the expressed purposes of its creation, taken as a whole, as it is upon certain of the details thereof with respect to which he urges that these are too indefinite to be given effect. This charge of indefiniteness which the appellant makes against certain of the provisions of this trust is twofold. It is directed, first, against the beneficiaries of the trust, and, second, against the powers and functions of the trustees who are to seek to carry its provisions into effect. As to the first of these, it may be stated generally that the element of indefiniteness in the beneficiaries of a charitable trust is not only not an objection to its validity, but, as a rule, is of the essence of all charitable trusts of a public or *quasi*-public character. This principle was well established by this court in the case of *Fay* v. *Howe*, 136 Cal. 599–601 [69 Pac. 423]. The trust in that case was in the nature of a bequest of the sum of $5,000, "the income to be used in aid of deserving aged native born in the town of Southboro, Mass. needing such aid." This trust was objected to as being void for uncertainty, and this court in dealing with that objection said: "In the case of a private trust there must be certainty as to the beneficiaries, but in charitable trusts individuals are not named, for the reason that, if named, the gift becomes a donation to individuals, and, losing the character of indefiniteness as to persons—which is the essence of a charitable trust—it is no longer a charitable trust. Inherent in every charitable trust is the very characteristic against which appellant's argument points—namely, indefiniteness of beneficiaries." The appellant points a particular objection at the language of section II of paragraph 6 of the trust instrument because of the use therein of the term "working people" as being a phrase which is meaningless

as defining any particular class of people, but it is evident
that this is a hypercritical objection, since not only have
such phrases as ''the working classes'' attained a very
definite signification in our modern life, but the very con-
text of the trust instrument in which it occurs illuminates
its meaning and application by defining with much detail
the particular functions which the trustees are to perform
in the way of improving ''living conditions of the working
people.'' They are to ''investigate the causes of poverty,''
with a view to ''preventing the operation of such causes.''
They are to investigate and encourage the introduction of
''the cooperative system of selling and purchasing food . . .
generally known as the 'Rochdale system of cooperation.' ''
The section in the trust instrument immediately following
the one under criticism (sec. III) pursues the subject fur-
ther with an amount of detail too long to quote, but render-
ing perfectly clear the meaning of the term ''working peo-
ple'' which the donors intended should be the beneficiaries of
the activities of the trustees in carrying into effect this
clause. ■ The appellant urges the charge of indefinite-
ness against two other particular clauses in said trust instru-
ment, viz., section IV of paragraph VI and section VIII of
paragraph VI thereof. The first of these empowers the
trustees ''to induce, encourage and support industrial co-
operation to the end that *justice* may be done to employer
and employee alike, and harmony be established and main-
tained between them, and industrial hatred and strife abol-
ished, thereby benefiting mankind in general.'' By the
second of these clauses the trustees are empowered ''to pro-
mote *justice* for the American Indian in the United States
by assisting in procuring legislation, and/or by stimulating
the proper enforcement of legislation to that end and/or
by assisting individual or bodies of Indians in attaining that
justice.'' The emphasis with which the appellant urges his
objection to each and both of these clauses is laid upon the
word ''justice,'' which, he argues, is entirely too indefinite
as to its meaning to support these particular trusts. As to
the first of these clauses thus objected to, it would seem to
be manifest that the way in which ''justice'' between em-
ployer and employee is to be attained is by the principle and
practice of industrial co-operation; and thus the meaning

of the term "justice" as used by the creators of this trust is indicated and might be very well and truly expressed in the definition which Justinian has given us of that word, viz., "The constant and perpetual disposition to render every man his due." As thus defined there is no uncertainty in the purpose of the creators of this trust as expressed in clause VI of paragraph VI of this document. Whether that purpose can be achieved by the means which the trustees are empowered to promote is a matter with which the courts, in the first instance at least, have nothing to do, but which, at the last analysis, they might have power to direct under the exercise of their equity jurisdiction in the control over trusts. ▪ As to the objection which the appellant urges against clause VIII of paragraph VI of said trust instrument, it must be conceded that a greater state of indefiniteness exists. The trustees are empowered "to promote *justice* for the American Indian." This they are to do "by assisting in procuring legislation and/or by stimulating the proper enforcement of legislation to that end." The meaning assigned to the word "justice" as above defined clarifies somewhat the purpose which the creators of this particular trust had in view, since it may not be denied that there was a large measure of injustice meted out to the Indian in the earlier history of our republic, and it might also be conceded for the sake of argument that there still remains a large degree of inefficiency in the administration of legislation aimed at the correction of that ancient wrong through the lifting of the American Indian up to the level and statute of those equal rights and duties pertaining to American citizenship. That the correctness of these assumptions may be disputable would not render the effort of the creators of this trust abortive, nor would the fact that the powers of the trustees in attainment of the end they had in view are not more exactly defined necessarily render the trust itself invalid. ▪ As we have seen, courts of equity possess enlarged powers in giving effect to trusts for charitable uses. In the exercise of these powers this court has declared in a leading case that "Courts look with favor upon all attempted charitable donations and will endeavor to carry them into effect if it can be done consistently with the rules of law. A bequest intended as a charity is not void and

there is no authority to construe it to be legally void if it can possibly be made good.'' (*Estate of Hinckley,* 58 Cal. 457; *Estate of Willey,* 128 Cal. 1 [60 Pac. 471]; *Estate of Merchant,* 143 Cal. 537 [77 Pac. 475].)

In *Estate of Hinckley, supra,* from which the foregoing excerpt is taken, the court learnedly and exhaustively discussed the power of the courts of this state to assume equitable jurisdiction over the administration of trusts clearly charitable in their nature, and in so doing to apply the doctrine of *cy pres* as a judicial power in directing trustees to carry into effect a general lawful and charitable intent on the part of the creators of the trust when such intent is manifest when the trustees are named and when the beneficiaries of the trust are ascertainable. The final sentence in the foregoing clause aids somewhat in determining its validity, since it is therein provided that the trustees are to be empowered to extend aid to particular Indians or groups of Indians in attaining those ends which the term ''justice'' as above defined connotes. We are therefore of the opinion that this particular clause in the trust instrument ought not in the first instance to be held invalid. We are thus brought to the second objection which the appellant urges against the validity of this attempted trust foundation treated as a whole, which is that the powers and functions with which the trustees thereof are invested are too indefinite to justify the court in upholding it and by so doing is creating in them a perpetuity with practically unlimited powers. When, however, we take this lengthy and evidently carefully prepared document by the four corners and read it as a whole, we find that the statement of the appellant in urging this particular objection must be taken with much modification. In the first place it is evident from the reading of this document as a whole that the methods of exercise of the powers and functions with which its trustees are to be invested are in the main educational. The manifest object of the creators of this trust was that of the formation and direction of an enlightened public opinion with relation to the particular subjects to which in its detail it is related, and as the result of that educated and enlightened opinion to bring about the adoption of concrete legislation or the acceptance of certain clearly stated social or economic reforms.

The instrument is not lacking in certain definite directions to the trustees along these identical lines. The trustees are to conduct investigations as to the causes and prevention of poverty among working people and are also to investigate and encourage the adoption of a co-operative system of marketing; and generally to encourage and support industrial co-operation as between employers and employees. They are to afford educational opportunities for the study of governmental, industrial, and social problems and reforms, and they are to accomplish these objects by employing lecturers and instructors and by furnishing appropriate books and literature and by donations to institutions and organizations to be applied in the furtherance of the foregoing purposes. They are to buy, print, publish, and distribute pamphlets, newspapers, magazines, and books "and to disseminate by all lawful means such information as in the judgment of the trustees may be useful in carrying out the purposes of this trust." The foregoing will sufficiently indicate the scope of the general powers with which the trustees of this foundation are by its specific terms invested. That the means which these trustees are to thus employ in the furtherance of its purposes are to be "lawful means" is expressly stated in the document itself, and by such expression the creators of the trust have relieved its trustees of the imputation of the appellant that this was a so-called "lobbying trust" to bring about legislation of various kinds by disreputable and unlawful methods. In a word, we find nothing in this trust which conveys the remotest suggestion that the trustees thereof are to employ or that they would be justified in employing other than the usual upright, open, and approved methods by which foundations charitable in character and educational in method are wont to carry on their work. The present trust differs in no essential respect from numerous other like foundations in various parts of the country which are devoted to the achievement of some, though not, perhaps, of all, of the objects of this particular foundation, and which have been generally approved by the courts. The creators of this trust having, as recited therein, devoted a large part of their lives and a considerable portion of their fortune unselfishly to the promotion of the particular ideas of political and social

reform which they are now seeking to have perpetuated beyond the period of their natural lives through this foundation, are to be commended rather than criticised for their desire to render permanent their life work. This method of achieving immortality is all too rare, and while we may not all agree upon the question as to whether or not certain details of these projected reforms in our political or social life are practical or even altogether desirable, we may not for that reason hold this foundation to be invalid by virtue of the defects in its creation which are urged by the appellant herein.

The judgment is affirmed.

Curtis, J., Shenk, J., Langdon, J., Waste, C. J., Seawell, J., and Preston, J., concurred.