[S. F. No. 16932. In Bank. Aug. 10, 1943.]

CITY AND COUNTY OF SAN FRANCISCO et al., Petitioners, v. HAROLD J. BOYD, as Controller, etc., Respondent.

John J. O'Toole, City Attorney, and Walter A. Dold, Chief Deputy City Attorney, for Petitioners.

Jesse H. Steinhart, John J. Goldberg and S. A. Ladar for Respondent.

Leo R. Friedman as Amicus Curiae on behalf of Respondent.

GIBSON, C. J.—By this proceeding in mandamus the city and county of San Francisco and its Public Utilities Commission seek to compel respondent, as controller of the city and county, to audit and approve wage claims of certain motormen, conductors, streetcar operators and bus operators employed by the municipal railway at the rates of compensation fixed in the Salary Standardization Ordinance (Ordinance # 2184), effective July 1, 1943, and in the Annual

Salary Ordinance for the year 1943-1944 (Ordinance # 2148), also effective July 1, 1943. In support of his refusal to audit and draw warrants for these claims, the respondent contends that their payment would constitute an illegal expenditure of public funds for the reason that the cited ordinances are void as being in contravention of section 151 of the city charter.

So far as presently material, section 151, by virtue of an amendment effective January 11, 1943, provides:

"The board of supervisors shall have power and it shall be its duty to fix by ordinance from time to time, . . . all salaries, wages and compensations . . . for the positions, or places of employment, of all officers and employees of all departments, offices, boards and commissions of the city and county in all cases where such compensations are paid by the city and county. . . .

"In fixing schedules of compensation as in this section provided, the civil service commission shall prepare and submit to the board of supervisors and the board shall adopt a schedule of compensations which shall include all classifications, positions and places of employment the wages or salaries for which are subject to the provisions of this section; . . . *The compensations fixed as herein provided shall be in accord with the generally prevailing rates of wages for like service and working conditions in private employment or in other comparable governmental organizations in this state; . . .*"

The Annual Salary Ordinance for the fiscal year just expired (1942-1943) had provided rates of compensation for motormen, conductors and bus operators ranging from 80c to 87½c an hour depending on the type of work and the length of service.

Between January 15 and March 2, 1943, pursuant to the provisions of section 151 of the charter, the Civil Service Commission conducted a comprehensive investigation and by such survey obtained facts and data concerning wages paid to motormen, conductors, streetcar operators and bus operators for like service and working conditions in private employment and in other governmental organizations in this state. This survey extended to the rates of wages paid such employees in fourteen communities by some nineteen transportation systems or their branches, representing all of the street railway systems and comparable bus lines in the state. A schedule of the data thus considered by the commission

discloses rates of pay ranging from 70c to 93½c an hour. It appears, however, that only operators of one-man cars and bus drivers received in excess of 87½c an hour. Based on such data and on changed economic conditions resulting in an increased cost of living, the commission, as required by the charter, after several public hearings at which all interested persons were heard, published its proposed schedule of rates of wage ranging from 85c to 92½c an hour, together with a comparison of existing schedules. Thereafter (and also as required by the charter) the commission transmitted the schedule to the board of supervisors with a summary of the facts and data obtained and considered by it in recommending the proposed rates.

Following many hearings the board of supervisors approved and adopted the rates of wage as recommended by the Civil Service Commission excepting only the rates proposed for bus operators. As to the latter class the board, under authority of the charter, amended the schedule proposed by the commission, and fixed the rates of pay at 5c an hour higher, the maximum rate being 97½c an hour. Thus, the board of supervisors in thereafter adopting the Salary Standardization Ordinance and the Annual Salary Ordinance, fixed rates of wages for motormen, conductors, streetcar operators and bus operators, ranging from 85c to 97½c an hour.

Respondent's principal contention is that these ordinances are invalid for the reason that the board of supervisors in fixing the rates exceeded the authority granted to it by section 151 of the charter. While conceding that the fixing of rates of compensation for municipal employees is a legislative function (citing to that effect *San Diego Water Co.* v. *San Diego,* 118 Cal. 556 [50 P. 633, 62 Am.St.Rep. 261, 38 L.R.A. 460]; *Contra Costa Water Co.* v. *Oakland,* 159 Cal. 323, 335 [113 P. 668]; *Smyth* v. *Ames,* 169 U.S. 466 [18 S.Ct. 418, 42 L.Ed. 819]), respondent contends that the power of the board of supervisors in this respect is subject to the charter limitation that the compensations fixed "shall be in accord with the generally prevailing rates of wages for like service and working conditions in private employment or in other comparable governmental organizations in this state," and that the power of the Civil Service Commission is subject to the limitation that the rates recommended by it be "in accordance" with the prevailing rates of compensation. He argues that since the rates fixed in the ordinances exceed to

the extent above noted the maximum rates paid elsewhere in this state to like employees for comparable work, they are not "in accord with" or "in accordance" with the generally prevailing rates. In other words, respondent contends that the quoted phrases as used in the charter, mean not higher than the prevailing rates of wages.

In our opinion, the phrases do not require that the rates of wages recommended by the commission or fixed by the board be identical with or not higher than the generally prevailing rates, but rather that there be a reasonable or just correspondence between the rates established and those elsewhere prevailing, i.e., that they be in harmony with and substantially conform to such other rates. (See Webster's Int'l. Dictionary; The Oxford English Dictionary; Roget's Thesaurus.) The word "accordance" is defined in Webster, *supra*, and in Black's Law Dictionary to mean in "agreement; harmony; concord; conformity." It should be noted that prior to its amendment in January, 1943, section 151 provided that the rates of compensation fixed "shall be not *higher* than prevailing rates for like service and working conditions." The amendment deleted that express limitation.

■ The determination whether proposed rates of compensation are in accord or in harmony with generally prevailing rates is within the discretion of the rate-making authority. The courts will not interfere with that determination unless the action is fraudulent or so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law. (See *Hannon* v. *Madden*, 214 Cal. 251, 257 [5 P. 2d 4]; see, also, *Mann* v. *Tracy*, 185 Cal. 272 [196 P. 484]; *In re City and County of San Francisco*, 191 Cal. 172, 184 [215 P. 549]; McQuillin, Municipal Corporations, 2d ed., sec. 535, p. 301.)

Respondent concedes that this court is not required to determine the generally prevailing rates of compensation and admits that a writ of mandamus should issue unless it is concluded "that upon no conceivable basis under all of the evidence . . . can the rates as fixed be brought within the charter limitation." The evidence discloses that the generally prevailing rates of compensation are somewhere between 70c and 93½c an hour, the minimum and maximum rates paid by other transportation systems in the state. Under the facts of the present case we are not prepared to hold that the board of supervisors abused its authority to fix rates "in accord with" or in harmony with the generally prevailing rates of compensation.

Respondent also contends that the ordinances are invalid for the reason that the Civil Service Commission failed to comply with certain requirements of section 151 of the charter prescribing the procedure to be followed in formulating a proposed schedule of rates of compensation. This procedure is outlined in the following portion of section 151:

"The proposed schedules of compensation or any amendments thereto shall be recommended by the civil service commission solely on the basis of facts and data obtained in a comprehensive investigation and survey concerning wages paid in private employment for like service and working conditions or in other governmental organizations in this state. The commission shall set forth in the official records of its proceedings all of the data thus obtained and on the basis of such data the commission shall set forth in its official records an order making its findings as to what is the generally prevailing rate of pay for each class of employment in the municipal service as herein provided, and shall recommend a rate of pay for each such classification in accordance therewith. The proposed schedules of compensation recommended by the civil service commission shall be transmitted to the board of supervisors together with a compilation of a summary of the data obtained and considered by the civil service commission and a comparison showing existing schedules. Before being presented to the board of supervisors for consideration, the proposed schedules and a comparison with existing schedules shall be published once a week for two weeks. ..."

It is agreed that the commission proceeded in conformity with the requirements of the foregoing charter section except it is claimed that it did not set forth in the official records of its proceedings all of the data obtained in its investigation, nor did it set forth an order making its findings as to the generally prevailing rates. As before stated the commission made a survey of the rates of wages paid to conductors, motormen and bus operators in all streetcar and bus line operations of all street railway systems and comparable bus lines in the State of California. In formulating its recommendations to the board of supervisors the commission had before it and considered all the facts collected in such survey. Not all of this data was set forth in its official records but it did set forth therein a Summary of Wage Recommendations and Supporting Data. This summary listed among other things the present rate paid by the municipal railway, the

prevailing union wages, and the appropriate prevailing wage for all such designated employees. These schedules reflected the findings of the commission with respect to prevailing wages and constituted a substantial compliance by the Civil Service Commission with the procedural steps enumerated in section 151. Moreover, the charter section provides that "The board of supervisors may approve, amend or reject the schedule of compensations proposed by the civil service commission." Thus it is clear that the rates of compensation are fixed by the board of supervisors and involve an exercise of the independent judgment of that body. A compilation of the data obtained and considered by the commission with its recommendations was transmitted to the board. The board thereupon held many hearings after which these ordinances were enacted fixing the rates of compensation pursuant to the schedule recommended by the commission and *amended* by the board.

The case of *Sullivan* v. *McKinley,* 14 Cal.2d 113 [92 P.2d 892], relied on by respondent, does not support his contention that the ordinances here involved are invalid. In that case certain persons employed as car painters by the municipal railway sought a writ of mandamus to compel the payment to them of a rate of wage of $10 a day as provided in the annual salary ordinance. Payment was resisted on the ground that a $9 rate of wage had been fixed for them in the budget and annual appropriation ordinance. In denying a writ this court held, in view of the provisions of section 71 of the charter that "All increases in salaries or wages . . . shall be determined at the time of the preparation of the annual budget estimates and the adoption of the annual budget and appropriation ordinances . . . ," any effort of the board of supervisors to increase a wage scale in the annual salary ordinance over the amount provided in the approved budget was void. It was pointed out that "Once the budget is approved by the Board of Supervisors, the fiscal terms of the annual appropriation ordinance and the annual salary ordinance are automatically fixed beyond the power of change by any amendment." In the present case the increase was timely and was published as provided in the charter, thus affording opportunity to interested parties to object thereto. ■ While an ordinance is invalid if the mandatory prerequisites to its enactment are not substantially observed (*Sullivan* v. *McKinley, supra,* 117; McQuillin, Municipal Corporations, 2d ed., p. 747, sec. 709), no attack is here made on the procedure

followed by the board itself; and as there was substantial compliance by the commission with the procedural steps governing its action, we do not find it necessary to determine whether the validity of an ordinance enacted by the board of supervisors could be affected by irregularities or defects in the procedure followed by the commission.

 *~There is nothing in the record indicating that this proceeding is collusive. On June 29, 1943, an action was commenced in the superior court by a taxpayer to enjoin payment of the compensations provided in the ordinances in question. Because of the pendency of that action respondent controller refused to audit and approve wage claims of employees of the municipal railway. This proceeding in mandamus was thereupon commenced by the city and its public utilities commission. The taxpayer, plaintiff in the superior court, filed a petition for leave to intervene *which was thereafter withdrawn.* It appears from the petition and the answer thereto that a sum of money was appropriated by the board of supervisors to employ and pay counsel to represent respondent controller in this proceeding. In his petition to intervene the taxpayer alleged that the present proceeding was ''an amicable suit'' and was brought to ''by-pass'' his superior court action. Upon the hearing of this proceeding, however, the attorney for the taxpayer declared, ''I did state in my brief that this was an amicable suit. I have listened to [counsel for respondent] and he has made, as he always does, a very able presentation of his side of the matter. I have no desire to disrupt the agreed statement of facts in this proceeding, but I would like an opportunity to present my views so far as they are applicable to this charter. Whether that is done by the court granting my application [to intervene] is a matter of indifference to me so long as I have an opportunity to present the legal phase of it, as I see it.'' After orally presenting his views on the issues involved, and receiving permission to file a brief ''as a friend of the court'' (which brief has been since filed), he withdrew his petition for leave to intervene. It is evident from these facts and the contents of the brief filed on behalf of the taxpayer that he does not claim this proceeding is collusive.

 A suit is not condemned by law merely because it is friendly (*Price* v. *Sixth Dist.*, 201 Cal. 502, 516 [258 P. 387]; *Golden Gate Bridge etc. Dist.* v. *Felt*, 214 Cal. 308, 316 [5 P.2d 585]). It is true, of course, that an action not founded

upon an actual controversy between the parties to it, but which is brought for the purpose of securing a determination of a point of law for the gratification of the curiosity of the litigants, or the sole object of which is to settle rights of third persons who are not parties, is collusive and will not be entertained. (*Golden Gate Bridge etc. Dist.* v. *Felt, supra; Collier* v. *Lindley,* 203 Cal. 641, 644, 645 [266 P. 526]; *People* v. *Pratt,* 30 Cal. 223.) This is not such a case. Respondent, as a public officer is bound by oath to faithfully perform and discharge the duties of his office. He would be acting in violation of his public duty if he authorized payment of claims that involved an illegal expenditure of public funds. Whether he could safely approve the payment of these claims depends upon the validity of the ordinances authorizing the compensation, and the determination of this question involves a construction of the charter and the application of its provisions to the facts of this case. His right to approve the payments had been challenged in a suit. A real controversy therefore existed as to respondent's duties in the premises.

The fact that the fees of counsel for both sides ultimately must be paid from public funds does not render the proceeding collusive. It has been held that in litigation involving only private parties and rights, payment of all counsel fees by one party to the litigation may give that party "such control over both the preparation and argument of the cause, as to make the suit . . . collusive . . ." (*Gardner* v. *Goodyear etc. Co.,* 131 U.S. Appendix ciii [21 L.Ed. 141].) This does not apply, however, where, as here, the adversary parties are a municipal corporation and one of its officers. It is not uncommon for a public official charged with the auditing or disbursement of public funds to question expenditures directed by another officer, agency or department of government. His refusal to audit or pay claims frequently gives rise to controversies which usually can be settled only by the judgment of a court. The fact that the opposing parties are authorized to employ attorneys who are paid from public funds does not render the suit collusive since the common source of such payment does not give one party control over the preparation and argument of the cause. There is nothing in the record before us which indicates that the board of supervisors selected counsel for respondent or exercised any control over the preparation or presentation of the case on behalf of respondent. There have been many cases in the courts of this state involving public officers similar to the

present suit in which opposing parties were represented by attorneys who were paid from the same public source, yet no contention was made that the suits were thereby rendered collusive. See *Parker* v. *Riley,* 18 Cal.2d 83 [113 P.2d 873, 134 A.L.R. 1405]; *Swing* v. *Riley,* 13 Cal.2d 513 [90 P.2d 313]; *Railroad Commission* v. *Riley,* 12 Cal.2d 48 [82 P.2d 394]; *Vandegrift* v. *Riley,* 220 Cal. 340 [30 P.2d 516]; *Heron* v. *Riley,* 209 Cal. 507 [289 P. 160]; *Hecke* v. *Riley,* 209 Cal. 767 [290 P. 451]; *Stockburger* v. *Riley,* 21 Cal.App.2d 165 [68 P.2d 741].) In *Golden Gate Bridge etc. Dist* v. *Felt,* 214 Cal. 308 [5 P.2d 585], the district sought a writ of mandate to compel Felt, as secretary of the district's board of directors, to sign certain bonds proposed to be issued by it. Amici curiae, representing certain taxpayers not parties therein, contended that the proceeding was collusive. This court disposed of the contention as follows: ''It is conceded that respondent secretary is personally desirous of a decision in favor of petitioner. In other words, this is a friendly suit. It appears that the bridge district agreed to reimburse respondent for the expense incurred by him in the litigation, in the event that the contractors or the bidders for the bonds or other persons interested did not do so. . . . These facts, *amici curiae* assert, show that the proceeding is fictitious and collusive, being a mere attempt to secure an advisory opinion without an actual contest. . . . Neither on principle nor authority does this position commend itself to us. . . . Nor is the fact that he [respondent] is removable at the pleasure of the board material. . . . A genuine controversy existed. . . . Able counsel were retained to present the case for respondent to this court, and it is not suggested that they were lacking in diligence or good faith in their preparation of the case. Under these circumstances this court can properly consider the petition and adjudicate the issues raised therein.'' The parties here were ably represented and the issues were fully developed and forcefully presented in evident good faith, and as before stated there is no evidence of collusion in this proceeding.

Let a peremptory writ of mandate issue as prayed, and pursuant to stipulation of the parties waiving the right to petition for rehearing and the statutory time within which such writ may issue, it is ordered that such peremptory writ may issue upon the filing of this decision.

Shenk, J., Schauer, J., and Carter, J., concurred.

CURTIS, J.—I dissent. I agree with the conclusion reached by the majority opinion upon all questions discussed therein excepting that part which holds that this action is not collusive. The answer of the city and county, filed herein, to the petition for leave to intervene in this action, filed by a taxpayer of the municipality, admits that the board of supervisors appropriated a substantial sum of money to pay the attorney representing the controller in the defense of this action. This action, as shown by the majority opinion, is to sustain an ordinance of the board of supervisors. The plaintiff contends that this ordinance is a valid legislative enactment of the board. The defendant contends that it is unconstitutional and void. These admitted facts show conclusively that the action is collusive. The majority opinion goes far beyond any of the authorities cited therein in support of its ruling.

EDMONDS, J., Dissenting.—I cannot join in a decision which, in my opinion, upholds an ordinance authorizing the payment of wages concededly larger than the highest amounts for like services paid elsewhere in the state, in defiance of express provisions of the city's charter.

In September, 1942, the Board of Supervisors of San Francisco ordered a proposed amendment to section 151 of the charter submitted to a vote of the people. Pursuant to the provisions of section 183 of the charter, the board then authorized the mailing of a statement to the voters under the heading: "Standardize Municipal Salaries In Accord With Private Employments. Vote Yes." The reasons for approving the proposed amendment were summarized as follows:

"It provides that municipal salaries shall be in accord with the general prevailing rate in private or other governmental organizations.

"It provides for all employees instead of a favored few.

"It provides for a minimum salary of $106 per month for a full time employee.

"It provides for periodic surveys to keep schedules in line with private employment."

In conclusion the statement added: "We must end favoritism in municipal salaries. We must put municipal and private salaries in accord."

The new section was adopted at the November election, and ratified by the Legislature of 1943.

Prior to its amendment, section 151 provided that compen-

sations to be standardized "shall be not higher than prevailing rates for like services and working conditions in private employment or in other comparable governmental organizations in this state." By the amendment, the words "shall be in accord with" were substituted for "shall be not higher than." The reason for the change is clear. Before the amendment was adopted, the municipal employee had no assurance that he should receive the generally prevailing wage, for the charter only fixed a maximum limitation beyond which his compensation could not go. The amendment retains the limitation but also declares that the employee shall receive the generally prevailing wage, which is a fair and practical standard from the standpoint of both the employee and the taxpayer.

That this is the proper construction of the amendment clearly appears from the argument sent to the voters. Implicit in the statements that the proposed amendment "Provides for all employees instead of a favored few" and that "We must end favoritism in municipal salaries—we must put municipal and private salaries in accord," is the fact that under the provision then existing, prescribing only a maximum limitation upon the compensations of the city's employees, only those in a few classifications were receiving that wage and that they were the "favored few" with whom the salaries of the other municipal employees should be equalized. Thus the people, in voting for the charter amendment, were informed not only upon the authority of the board of supervisors, which had placed the measure upon the ballot "with favorable recommendation," but also by the wording of the proposed amendment, that the municipal salaries would be not higher nor lower than, but "in accord with" the rates prevailing in private employment, thereby enabling the city's employees to obtain the same compensation as the sometimes more-favored privately-employed workers performing the same duties.

There is nothing in either the amendment, or the reasons advanced in favor of its adoption, to indicate that the purpose of the new provision is to give the employee in public service an advantage over those privately employed, or to authorize the payment of a larger wage than the highest paid by any other employer in the state. The only authority which the board has to fix a rate of compensation higher than that prevailing in comparable employment is to provide a minimum

wage in the municipal service of $106 per month. And the provision of the proposed amendment in this regard was one of the points emphasized in the statement to the voters. With the exception of this minimum standard, not only would the allowance to the municipal employee of a greater wage than that generally prevailing violate the limitation usually found in municipal charters that the taxpayer shall pay no more than private industry for the services of its employees, but it would also be contrary to the procedure of the proposed amendment, which, as construed by the statement to the voters, "provides for periodic surveys to keep schedules in line with private employment." And a court, in interpreting a charter provision adopted by the voters, should give it a construction consistent with the general and customary understanding of the words used.

Certainly the amendment was not adopted for the immediate benefit of the municipal street car employees, for they, at the time of the election, were included in the "favored few" who were already receiving the highest wage then prevailing for like services paid by any street car operator in the state. In fact, it may fairly be said that the salaries which they were receiving, prior to the adoption of the amendment, were being paid in violation of the charter. For from the stipulated facts in this case, it appears that, in recommending rates to be paid the motormen and conductors of the municipal railway for the fiscal year 1942-43, the Civil Service Commission knowingly acted contrary to the plain limitation of the city charter with the acknowledged purpose of avoiding labor difficulties, as it justified increasing the rates of these employees to amounts larger than the highest paid elsewhere in the state for like services, upon the ground "that disruption of transportation service would interfere with production of vital war industries and would also seriously inconvenience a large portion of the population of the community." And as a further reason for its action, said the commission, it "is of the opinion that when the provisions of Section 151 of the charter were drafted by the freeholders and subsequently adopted by the people, they could not know of the problems that would be created by the war conditions which we now face." However, the commission concluded, its action "shall not be considered or construed in any sense as a precedent in future cases."

Yet despite the clear purport of the amendment to correct inequalities existing because most municipal employees were

receiving less than the rates prevailing for like services in private employment and other governmental organizations, a majority of this court construe the amendment as authorizing a still higher rate of compensation for the "favored few" already receiving the highest prevailing rate, and declare that, because of it, the board of supervisors may now fix a wage "higher than the generally prevailing rates." I submit that their conclusion in this regard, and as applied to the facts of this action, is not justified in law or in fact.

The case is decided upon these two issues: (1) Are the compensations fixed in the schedule adopted by the board of supervisors "in accord with the generally prevailing rates of wages for like service and working conditions in private employment or in other comparable governmental organizations in this state"; and (2) if so, did the failure of the Civil Service Commission to follow the requirements of the charter in establishing its recommended schedule of compensations render the ordinance invalid?

It is conceded that the charter provision requiring the compensation schedule to be "in accord with the generally prevailing rates of wages" is mandatory and that if the compensations for the municipal railway employees established by the ordinance under consideration are not so in accord, the ordinance is void. And the majority opinion admits that "The evidence discloses that *the generally prevailing rates of compensation* are somewhere between 70c and 93½c an hour, the minimum and maximum rates paid by other transportation systems in the state." (Italics added.) It also states that the rates fixed by the board of supervisors range from 85c to 97½c an hour, but does not break down these figures to reveal the fact that the proposed municipal wage is five cents higher than the highest amount paid by any other operator of street railway service in the state for comparable classifications of employees.

Is, then, a wage which is five cents an hour higher than the highest wage paid by any private corporation whose schedule is included in the survey relied upon by the commission, or which is five cents an hour lower than the lowest wage shown, "in accord with" the prevailing wage for such services? The definitions of "accordance" in Webster's International Dictionary and in Black's Law Dictionary, are quoted in the majority opinion as meaning in "agreement; harmony; concord; conformity." But the majority opinion's addition

of the word "substantially," when speaking of the measure of conformity required by the charter, is an acknowledgment that its conclusion cannot rest upon the language of that instrument. To so qualify the people's requirement in this regard is judicial legislation in its plainest form.

The majority opinion reaches its conclusion as to the validity of the rates by treating the question as one within the range of legislative discretion. The legislative determination of what is "in accord with" the prevailing wage is one which will be disturbed, says the majority opinion, only upon a showing of an abuse of authority by the legislative body. "The courts," it states, "will not interfere with that determination unless the action is fraudulent or so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law." Such a rule would be applicable if the only duty of the commission and the board of supervisors were to fix a "reasonable" salary. (See *Graves* v. *Paducah*, 28 Ky.L.Rep. 576 [89 S.W. 708].) But the charter provision establishes a definite standard for legislative and administrative action.

None of the authorities in the majority opinion sustains the rule for which it is cited. Thus in *Mann* v. *Tracy*, 185 Cal. 272 [196 P. 484], the petitioner attacked a ruling of the Civil Service Commission, made prior to the giving of an examination, which limited to three years the maximum period during which an eligible list should remain effective. The court found no charter limitation preventing such action, and based a decision upholding the action upon a charter provision allowing the commissioners to strike the name of a candidate from the list after it had been there for more than two years. And in *Hannon* v. *Madden*, 214 Cal. 251 [5 P.2d 4], the court considered the determination of a city council upon the question of a contractor's compliance with a street improvement contract. Not only was there no standard or limitation provided by the charter or constitution, but a state law then provided that "All decisions and determinations of said city council . . . shall be final and conclusive." Under such a statute, said the court, the decision of the council upon "such nonjurisdictional matters as the failure of the work to comply with the contract cannot be urged in a court action as grounds for invalidating the assessment," and it "may be attacked in a legal proceeding only upon pleading and proof that the board acted fraudulently or that its action is so palpably unreasonable and

arbitrary as to raise an inference of plain abuse of discretion as a matter of law.''

In the only other case cited by the majority opinion to support its statement, the action questioned was the wisdom of the city in entering into a contract with the county of Alameda for the latter's care of the former's tubercular patients. The court emphasized the fact that no charter provision or statute limited the right to make such a contract. On the contrary, said the court, '' 'The law casts upon the board the duty of determining whether in its judgment the public necessity required the county to acquire a new hospital and conferred upon it the power necessary to accomplish this if it should so determine. . . . Whether in the exercise of legislative powers the board acts wisely or unwisely is no concern of the courts.' '' In the absence of a showing of want of jurisdiction or of bad faith, the court continued, it would not inquire into the question of whether the city had made a good or a bad bargain. (*In re City and County of San Francisco*, 191 Cal. 172, 184, 185 [215 P. 549].)

Unlike the present action where the charter clearly establishes a definite standard for the legislative and administrative action, in all three of these cases there was no constitutional or charter limitation or standard governing or limiting the exercise of the area of discretion involved. And in the section of McQuillin on Municipal Corporations, cited by the majority opinion, appears the following statement of the principle: ''If the salary is fixed by the proper authority and in the manner prescribed, the general rule is that the courts will not interfere. . . . Usually the council or governing legislative body is given power to fix salaries of municipal officers and employees, which is done generally by ordinance (a legislative act) and not by mere resolution. Ordinances providing for salaries must conform with charter and statutory provisions, and cannot provide a salary less or greater than that fixed by the charter or statutes. . . . Where a salary is to be fixed by an officer or board it is an administrative act and need not be fixed by ordinance.'' (2 McQuillin on Municipal Corporations [2d ed. 1939], sec. 535, pp. 303-306.)

The charter of a municipality is its constitution and to be valid, an ordinance must harmonize with its provisions. (*Marculescu* v. *City Planning Com.*, 7 Cal.App.2d 371, 373 [46 P.2d 308]; *In re Pfahler*, 150 Cal. 71, 82 [88 P. 270, 11 Ann.Cas. 911, 11 L.R.A.N.S. 1092]; *Platt* v. *San Francisco*,

158 Cal. 74, 84 [110 P. 304]; *South Pasadena* v. [*Los Angeles*] *Terminal Ry. Co.*, 109 Cal. 315, 321 [41 P. 1093].) As has been aptly stated, ''An ordinance can no more change or limit the effect of the charter than a statute can modify or supersede a provision of the state Constitution.'' (*Marculescu* v. *City Planning Com., supra*, p. 373.) And, in considering a question arising under the San Francisco Charter, this court recently said that ''the provisions of the charter . . . must control the actions of the Board of Supervisors and the Civil Service Commission in determining the salary to be received'' by certain municipal employees. (*Banks* v. *Civil Service Com.*, 10 Cal.2d 435, 438 [74 P.2d 741].)

Under the provisions of the charter, the .''legislative'' action of the board of supervisors is predicated upon prior administrative action by the Civil Service Commission, and although the procedure established by the charter is culminated by the ''legislative'' act of passing an ordinance, the basic steps in adopting the ordinance are what would generally be called ''administrative'' in character. In this respect the adoption of the standardization ordinance is unlike the determination of fact implicit in the action of a state legislature or the federal Congress (see *People* v. *Western Fruit Growers, ante*, p. 494, 507 [140 P.2d 13]), but is comparable to that of legislative and administrative agencies. And it is a rule of universal application that one adversely affected by such action is entitled to a judicial determination as to whether any facts exist to support the administrative determination. (*South Chicago Coal & Dock Co.* v. *Bassett*, 309 U.S. 251, 257, 258 [60 S.Ct. 544, 84 L.Ed. 732]; *Interstate Commerce Com.* v. *Union Pac. R. Co.*, 222 U.S. 541, 547, 548 [32 S.Ct. 108, 56 L.Ed. 308]; *Northern Pac. R. Co.* v. *Dept. of Public Works*, 268 U.S. 39, 44, 45 [45 S.Ct. 412, 69 L.Ed. 837]; *Booth Fisheries Co.* v. *Industrial Com. of Wisconsin*, 271 U.S. 208, 209, 210 [46 S.Ct. 491, 70 L.Ed. 908].)

Obviously wide latitude must be allowed the commission in determining what is the ''generally prevailing'' wage within the limitations of the highest and lowest amounts paid by any other employer. But when the commission has obtained data showing the highest wage paid, there is no basis for saying that any greater sum is ''prevailing'' and the range of discretion is at an end; no wage exists with which the municipal rate may be ''in agreement'' or ''conformity.'' Consequently no data before the commission supports the rates arrived at by it and adopted by the board of supervisors.

For a majority of this court to refuse to enforce the plain language of the charter in deference to a determination unsupported by any evidence is, to me, indication of an unwillingness to check violation of constitutional or charter provisions. In my opinion, the use of the phrase, "legislative discretion," as applied to the facts of this case, is but an instrument of judicial self-abnegation for the avoidance of a constitutional function.

And if the decision of the majority of this court is, in reality, based upon the principle that a five-cent deviation above the charter limitation comes within the principle of *de minimis non curat lex,* I must again disagree. For I am sure that the public employee would consider the payment of a wage of five cents an hour less than the lowest paid elsewhere in the state to be of definite importance to his standard of living. Nor is an excessive wage of five cents an hour a matter too small for judicial concern in the consideration of a salary standardization ordinance fixing compensation in an aggregate amount of $20,000,000 for a single fiscal year.

In addition, the interpretation of the majority opinion renders useless the charter provision as a standard which either the employee or the taxpayer may enforce. For by what rule is the reviewing court to decide that a compensation of 10, 15, 25 cents or more per hour higher than the highest, or lower than the lowest, wages paid for like services in private employment is either within or without the permitted administrative and legislative discretion? Can it be fairly said that such a result was contemplated or intended by the people in adopting the charter provision?

A consideration of the second issue serves only to emphasize the accuracy of my conclusion that the compensations established by the ordinance are not and were not intended to be "in accord with" the generally prevailing rate. The basic limitation upon the action of the commission in drafting a proposed schedule is that its recommendations must be made "*solely* on the basis of facts and data obtained in a comprehensive investigation and survey concerning wages paid in private employment for like service and working conditions or in other governmental organizations in this state." To insure that the commission's consideration be confined to such data, the charter commands, first, that it "shall set forth in the official records of its proceedings *all of the data thus obtained.*" Secondly, the section requires that "*on the basis of*

*such data* the commission shall set forth in its official records *an order making its findings* as to what is the *generally prevailing rate* of pay *for each class* of employment in the municipal service.'' Finally, it ''shall recommend a rate of pay for each such classification *in accordance therewith.* (Italics added.)

The obvious purpose of these limitations is to prevent such an administrative determination as is now before this court for review. The charter carefully delineates the scope of the discretion which the commission may exercise, and limits a determination by the data, and only the data, of wages paid by other employers which were before it for consideration. And to safeguard the interests of the municipal employee and also of the taxpayer, the charter requires the commission to include in the record of its action both the data considered and the findings made upon it.

In excusing compliance with the charter provisions, the city attorney insists that the word ''shall'' is not always to be construed as mandatory, and although ordinarily having that meaning, as here used should be held to be directory only. Under some circumstances, such a construction is permissible, but the test is whether the requirement is of such importance and materiality to the purpose of the statute being considered as reasonably to permit the conclusion that the Legislature intended to allow action to be taken only upon compliance with the specified procedure. In this connection a court should consider whether an undue advantage is gained from failure to follow the steps outlined or a benefit to the public or to an individual is impaired or lost by the failure to do so. (See *Cake* v. *City of Los Angeles,* 164 Cal. 705, 710 [130 P. 723].)

Applying these tests to the procedural requirements of section 151, *supra,* it is clear that each is material to the admittedly mandatory provision requiring the compensation to be in accord with the prevailing rates of wages for similar service. Their importance in confining the action of the commission to tangible data and in establishing a clear record of the basis of that body's determination, unquestionably operates to the advantage of both the public and the affected employee, for it affords those interested a satisfactory means of challenging any asserted departure from the standard set by the charter, both before the board of supervisors, and in any judicial review of the action taken. The word ''shall'' there-

fore should be given its normal connotation, and the procedural requirements interpreted as mandatory.

The majority opinion recognizes that, as stipulated by the parties, the commission did not comply either with the requirement that it set forth in the official records of its proceedings all of the data obtained in its investigation, or with the requirement that it set forth therein "an order making its findings" as to the generally prevailing rates. Moreover, the record of the commission shows that its recommendation was not based "solely" upon the data which it considered. For none of those data included a rate comparable to the ones contained in the proposed schedule. In addition, the majority opinion admits, the commission based the schedule of rates, at least in part, "on changed economic conditions resulting in an increased cost of living." This statement conforms to the agreement of the parties that the commission, as a basis for its recommendation, "took into consideration the fact that since July 1, 1942, economic conditions had changed and the cost of living had increased." Yet the charter authorizes the commission or the board of supervisors to consider changed economic conditions only for the purpose of determining whether a new survey is necessary to make certain that compensation paid the municipal employees is still in accord with that prevailing for like service elsewhere in the state, and not as a factual basis for the computation of new rates. (Sec. 151, as amended.)

Thus it appears that the commission complied with none of the three major procedural requirements for a determination of recommended compensation. Yet despite this fact, and the admissions of noncompliance implicit in the opinion of the Chief Justice and in the agreed statement of facts, it is decided that the action of the commission "constituted a substantial compliance . . . with the procedural steps enumerated in section 151." And the discussion in the majority opinion, upon which this conclusion is predicated, is too general and ambiguous for a clear understanding of the measure of compliance by the commission with the requirements.

The stipulation of facts shows that the *only* data concerning the rates of wages paid by other street railway operators in the state, which were considered by the commission in recommending the proposed schedule, were set forth in a schedule prepared by the Public Administration Service, a nonprofit organization of Chicago. This schedule lists the 19

California communities in which street cars or buses are operated and the minimum and maximum rates paid by each operator. Neither this schedule nor the data contained therein was placed in the official records of the commission.

The only schedule which the commission did include in its official records was one entitled "Summary of Wage Recommendations and Supporting Data." Except for the then current San Francisco Municipal Railway rates, this summary does not purport to contain or identify the rates of any employer, public or private, nor can it be determined from the summary what rate of pay was being paid to any particular class of employee by any employer other than the city and county of San Francisco. Unquestionably, the summary does not contain "all of the data" on the subject of the compensations here involved which were obtained and used by the commission and which the charter requires should be set forth in its official records. This is further emphasized by the fact that in the summary under the heading "Appropriate Prevailing Rates" are set forth rates for each of the four classes of employees included in the commission's recommendation, ranging from 80c to 87½c per hour. There is no means whatever, based on examining the summary alone, of determining how such "Appropriate Prevailing Rates" were arrived at, thus demonstrating that they are based on underlying data not set forth in the summary or in the official records of the commission's proceedings.

And not even a suggestion appears in the stipulated record that the schedule containing the factual data used by the commission was available to public examination in even unofficial form or that the commission purported to make an order including its finding as to the prevailing wage rate. Under such circumstances, I see no basis in fact for the conclusion of the majority opinion that "These schedules reflected the findings of the commission with respect to prevailing wages and constituted a substantial compliance by the civil service commission with the procedural steps" of the charter.

Nor may the result reached in the majority opinion be justified by its statement that "the rates of compensation are fixed by an act of the board of supervisors and involve an exercise of the independent judgment of that body." For the determination of the board, as well as the commission, is confined to data which have been considered by the commission, and the same limitations apply to the area of discretion

it may exercise. Section 151, *supra,* provides that "the civil service commission shall prepare and submit to the board of supervisors and the board shall adopt" the schedule of compensations. The board of supervisors can only adopt a schedule of compensations "in accord with the generally prevailing rates of wages" for like services. The schedules recommended by the commission "shall be transmitted to the board of supervisors together with the compilation of a summary of the data obtained and considered by the civil service commission and a comparison showing existing schedules." In addition, the charter requires that, "before making any amendment" to the schedule of compensations recommended by the commission, "the data considered by the board of supervisors shall be transmitted to the civil service commission for review and analysis." Such provisions clearly show that the board, in adopting the schedule, is limited to specific data considered by the commission, and that the board's determination, as well as the commission's, must also be supported by such evidence.

If democracy is to continue to mean a government of law, then, as was said at an earlier time, "no argument of hardship will justify a court in setting at naught the written terms of a city's charter, even at the instance of the city's officials." (*San Christina Investment Co.* v. *San Francisco,* 167 Cal. 762 [141 P. 384, 52 L.R.A.N.S. 676].) And, as I pointed out in *City and County of San Francisco* v. *Linares,* 16 Cal.2d 441, 448 [106 P.2d 639], certainly this should not be done in a suit between the city and one of its administrative officers, for it allows a question of public interest to be conclusively decided in a proceeding which is not brought in such form as to allow a full and fair judicial examination of the merits of the controversy. Especially is this true where, as in the present proceeding, the city officials, purportedly adverse to one another on the issues presented, have waived in advance the right to apply for a rehearing. Moreover, the city attorney has admitted that the board of supervisors appropriated the money to pay the fees of counsel who are appearing for the respondent city controller. The United States Supreme Court very recently dismissed an action instituted as a "friendly suit." Characterizing it as collusive, the court said: "Even in a litigation where only private rights are involved, the judgment will not be allowed to stand where one of the parties has dominated the conduct of the

suit by payment of the fees of both.'' (*United States* v. *Johnson,* 319 U.S. 302 [63 S.Ct. 1075, 87 L.Ed. ——].)

For these reasons, in my opinion, the writ of mandate should be denied.

TRAYNOR, J., Dissenting.—It seems to me clear that the ordinance under review was adopted in violation of the provisions of the city charter. I cannot agree, however, with Justices Curtis and Edmonds that this is a collusive proceeding.